*Decision will be entered under Rule 50.*

ELIZABETH H. BARDWELL, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86394. Filed April 17, 1962.

*Gene W. Reardon, Esq.*, for the petitioner.
*Emory L. Langdon, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income tax for the calendar years and in the amounts as follows:

---

| Year | Deficiency |
|------|-----------|
| 1954 | $993.79 |
| 1955 | 973.09 |
| 1956 | 927.60 |
| 1957 | 957.48 |
| 1958 | 985.52 |

The issues for decision are:

(1) Whether payments received by petitioner from her divorced husband are includible in her gross income under section 71(a)(1) of the 1954 Code; and

(2) Whether the 6-year statute of limitations is applicable to the taxable years 1954 and 1955.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are hereby found as stipulated.

The petitioner, Elizabeth H. Bardwell (hereinafter sometimes referred to as Elizabeth), is an individual residing in Denver, Colorado. She timely filed individual Federal income tax returns for the calendar years 1954 through 1958 with the district director of internal revenue, Denver, Colorado.

Petitioner and Rodney J. Bardwell, Jr. (hereinafter referred to as Rodney), an attorney, were married on May 1, 1926. They lived together continuously as husband and wife until petitioner filed an action for divorce in the District Court in and for the City and County of Denver, Colorado, on August 1, 1952. In her petition for divorce, Elizabeth specifically asked for alimony. Two daughters were born of the marriage, Elizabeth Bardwell Steinmann, who was 21 years of age and married at the time of the filing of the divorce action, and Judith Anne Bardwell, born September 23, 1934.

On August 7, 1952, petitioner and Rodney entered into what was termed a "PROPERTY AND TEMPORARY ALIMONY SETTLEMENT" (hereinafter referred to as the agreement). This agreement listed all the assets petitioner and Rodney owned. All the property that Elizabeth and Rodney acquired, with the exception of a few items of furniture, was acquired with Rodney's earnings or were gifts to him. Rodney's partnership interest in Ivarod Foundation and Southern Agency Co., referred to in the agreement, were gifts from his father and mother.

For approximately 2 months prior to the execution of this agreement, there was a period of negotiation between Rodney and Philip Van Cise (hereinafter referred to as Van Cise), petitioner's attorney in the divorce action. Petitioner did not personally participate in these negotiations. The pertinent provisions of the agreement are as follows:

THIS AGREEMENT made this 7th day of August, 1952, Between RODNEY J. BARDWELL, Jr., herein called RODNEY, and ELIZABETH H. BARDWELL, herein called ELIZABETH.

The parties hereto are husband and wife having been married in Denver, Colorado, May 1, 1926, and they have two daughters, Elizabeth Bardwell Steinmann, is 21 years of age and married, and Judith Anne Bardwell who was born September 23, 1934 and is now residing with the parties hereto.

Differences have arisen between them and Elizabeth has sued for a divorce, and it is their desire to settle temporary alimony for 7 months only, and all property rights of every kind in lieu of any permanent alimony, also attorney fees, court costs and support money for Judith Anne.

The property and property interests are as follows:

(a) The parties own the home at 2080 Bellaire Street, Denver, Colorado, where the family are now living, as joint tenants with survivorship, which is free and clear of all liens and encumbrances.

(b) Rodney has two (2) automobiles which are free and clear of encumbrances—a 1949 Cadillac, Model 62, four door Sedan, and a 1950 Ford Custom Convertible.

(c) Rodney is an attorney practicing in Denver, and he also owns a one-fourth interest in the Ivarod Foundation, a co-partnership which owns seven apartment buildings in Denver, together with certain personal property, and a one-tenth interest in Southern Agency Co., a partnership which owns five apartment buildings in Denver, together with personal property therein.

(d) Rodney has retirement pay of $2,500.00 a year as of this date from the United States Government which is not subject to income tax, and owns stocks and bonds worth about $3,000.00. He also has in his possession stocks purchased by him in the name of Elizabeth, but endorsed in blank by her, which are worth about $9,000.00. Included therein are 100 shares of Massachusetts Investor's Trust worth about $4,000.00 and 25 shares Westinghouse Electric Company worth about $1,000.00.

(e) Elizabeth has about $700.00 in a bank account in her name.

(f) Rodney carries the following thirteen (13) life insurance policies, totaling $60,000.00:

| Number | Name | Amount |
| --- | --- | --- |
| 1393997 | Travelers Insurance Co | $5,000 |
| 660673 | Connecticut Mutual Life Ins. Co | 5,000 |
| 991278 | ____do | 10,000 |
| 1349438 | Mutual Benefit Life Ins. Co | 5,000 |
| 1444190 | ____do | 2,000 |
| 1706212 | ____do | 3,000 |
| 1809116 | ____do | 2,000 |
| 4601741 | Mutual Benefit Life Ins. Co. of N.Y | 3,000 |
| 4716426 | ____do | 2,000 |
| 4716427 | ____do | 5,000 |
| 4879961 | ____do | 5,000 |
| 4879962 | ____do | 3,000 |
| V 1304–85–17 | National Service Life Insurance | 10,000 |

Now, THEREFORE, it is hereby agreed between the parties:

1. Elizabeth is to occupy the home until September 15, 1952, on which date she is to vacate the same.

2. On or before said date Elizabeth is to convey her interest in said home to Rodney, and he is to pay her $12,500.00 in cash therefor, or give her a note for that amount due on or before five years with interest at five per cent (5%) per annum, payable in quarterly installments commencing December 15, 1952.

3. Rodney is to deliver to her the 100 shares of Massachusetts Investor's Trust

stock and 25 shares Westinghouse Electric Company stock as her property and she is to receive all dividends thereon since June 1, 1952. She relinquishes any claim to any other stocks.

4. Elizabeth is to retain the money in her bank account.

5. Rodney is to pay all bills contracted by either party to July 31, 1952, and any or all hospital, medical and dental bills for Elizabeth to 12 Noon September 15, 1952. Elizabeth is not to charge or incur any bills of any kind after July 31, 1952 and their joint charge accounts are to be cancelled as of that date.

6. Elizabeth, until she dies or remarries, is to be made the principal beneficiary in all of said life insurance policies, and they shall be kept in full force and effect and cannot be encumbered by Rodney in any manner without the consent of Elizabeth. However, she shall not be paid the principal on any of said policies, but the amounts due thereon on said policies shall be retained at interest by the Insurance Companies, and she shall be paid the sum of $600.00 a month therefrom until she dies or remarries, then any amount not paid to her shall go to such persons as Rodney may have made contingent beneficiaries. Rodney is to send Elizabeth, within twenty days of the date of premium payments by him, receipts or other evidence of such payments.

\*        \*        \*        \*        \*        \*        \*

8. Rodney is to pay Elizabeth as temporary alimony $350.00 a month commencing August 1, 1952, and continuing during the time she is occupying the home under the terms of this agreement. When Elizabeth moves out of the house, Rodney is to pay her temporary alimony of $425.00 per month, $212.50 on September 15, 1952, and $425.00 on the first day of each and every month commencing October 1, 1952, with the last payment of alimony on March 1, 1953.

9. Commencing April 1, 1953, Rodney is to pay Elizabeth $425.00 a month on the first of each and every month until she dies or remarries, these payments not to be alimony but as part of the property settlement. However, such payments shall cease on the prior death of Rodney.

10. Rodney is to convey the Ford automobile in good running condition to Elizabeth.

11. Elizabeth is to have the furniture itemized on Exhibit "B" attached hereto, and is to remove all of the same from the house on or before September 15, 1952.

12. If the divorce becomes final and Elizabeth applies for an Associate Membership in the Denver Country Club and is admitted thereto, Rodney shall pay the cost thereof of not to exceed $450.00. She shall pay her own costs at the Country Club after Rodney vacates the home.

13. Rodney is to move out of the home August 3, 1952, and is not to reoccupy the same as a home until September 15, 1952, or sooner, if Elizabeth vacates said home.

14. Rodney is to pay the court costs in the divorce action and a reasonable fee to Van Cise and Van Cise for their services as attorneys for Elizabeth.

15. As Judith Anne Bardwell is over fourteen years of age she can select her own guardian and live with either her mother or father or divide her time between them, however, Rodney shall pay for her college education and her necessary and proper support. Until September 15, 1952, Rodney shall pay Elizabeth $100.00 a month for Judith's household expenses, for food, laundry, etc.

16. In the event of the death of Rodney before April 1, 1953, Elizabeth is to have half of his then estate, and none of his interests in Ivarod Foundation or Southern Agency Co., are to be in any manner disposed of before that time.

17. In the event of the death of Rodney after any decree of divorce becomes final, the monthly payments herein provided for shall cease, and Elizabeth shall have no claims against Rodney's estate except for payments, if any, which

shall then be unpaid; The insurance payments shall then commence as provided in paragraph 6.

18. In consideration of the foregoing agreements and covenants Elizabeth hereby releases and discharges Rodney of any and all claims, demands or causes of action arising out of their marriage relationship or from any other source against his estate except as hereinabove provided and agrees to accept the provisions hereof in full settlement for all claims for permanent alimony or support and as widow's allowance and as a property settlement and for any other claims and demands whatsoever including but not limited by the within enumeration. This release shall run to the heirs, executors, administrators and assigns of said Rodney.

19. In consideration of the foregoing agreements and covenants Rodney hereby releases and discharges Elizabeth of any and all claims, demands or causes of action arising out of their marriage relationship or from any other source against her estate except as hereinabove provided. This release shall run to the heirs, executors, administrators and assigns of said Elizabeth.

This is a full and complete property settlement and agreement between the parties.

On September 9, 1952, an interlocutory decree of divorce was granted by the District Court and a final divorce decree was entered March 10, 1953. The final decree provided that the settlement agreement, *supra*, dated August 7, 1952, was approved by the Court and was ordered filed with the final decree.

On July 16, 1956, Rodney executed a life insurance trust agreement. Elizabeth approved and accepted this instrument. Thereupon, an amendment to paragraph 6 of the agreement dated August 7, 1952, was made. The amended paragraph is as follows:

6. Elizabeth, until she dies or remarries, is to be made the principal beneficiary in all of said life insurance policies, and they shall be kept in full force and effect and cannot be encumbered by Rodney in any manner without the consent of Elizabeth. However, she shall not be paid the principal lump sum on any of said policies, but the amounts due thereon on said policies shall be paid in installments so that she shall be paid the sum of $600.00 a month therefrom until she dies or remarries, then any amount not paid to her shall go to such persons as Rodney may have made contingent beneficiaries. Rodney is to send Elizabeth, within twenty days of the date of premium payments by him, receipts or other evidence of such payments.

For the years 1954 through 1958, petitioner received $425 per month or $5,100 per year from Rodney in accordance with paragraph 9 of the agreement. Petitioner did not report the receipt of these sums in her Federal income tax returns for the years in question. Although the agreement provided for the support of Judith Anne Bardwell, a minor, no part of the monthly payments was, in fact, for her support. The reason for this is that Judith Anne elected to live with Rodney.

For the years 1954 and 1955, petitioner did not disclose on her returns that she had received gross income in excess of $1,012.88 for 1954 and $825.38 for 1955. Petitioner's 1954 and 1955 Federal

income tax returns were filed on March 29, 1955, and April 12, 1956, respectively. The statutory notice of deficiency was issued on February 1, 1960. For the years 1954 and 1955, the petitioner omitted from her gross income amounts which were properly includible therein, and these amounts were in excess of 25 percent of the gross income stated in her returns for those years.

For each year from 1954 through 1958, respondent increased petitioner's taxable income by $5,100 per year because he determined that the payments petitioner received from Rodney were periodic payments resulting from a divorce decree.

#### OPINION.

### Issue 1.

The first question is whether the monthly payments petitioner received from her former husband are includible in her gross income under section 71(a)(1) of the 1954 Code.[1]

Petitioner was divorced from her husband under a decree of divorce dated March 10, 1953. The monthly payments in question were received after this decree. They were made to discharge a legal obligation incurred by the husband under a written instrument incident to the divorce. Whether or not the monthly payments were includible in petitioner's gross income depends on whether the legal obligation was incurred because of the marital or family relationship. Stated differently, were these payments what is commonly known as alimony?

It is petitioner's position that these payments are not includible in her gross income because they were in "recognition of a settlement of property rights." She points out that paragraph 9 of the agreement specifically states that "these payments not to be alimony but as part of the property settlement." Petitioner contends that this written agreement is the best evidence of what the parties intended. Respondent contends that the payments are includible in petitioner's gross income because all the provisions of section 71(a)(1), *supra*, have been met.

We agree with the respondent.

Contrary to petitioner's contention, the written agreement of August 7, 1952, is not in and of itself necessarily determinative of the

---

[1] SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS.

(a) GENERAL RULE.—

(1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE.—If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.

issue before us.[2] Whether the payments in fact represent alimony or whether they are in consideration of petitioner's interest in property is a question that turns upon the facts, and not upon any labels that may or may not have been placed upon them. *Ann Hairston Ryker*, 33 T.C. 924, 929 (1960).

It seems clear that the payments in question were not for an interest in any property that petitioner owned, but were designed primarily for her support. *Julia Nathan*, 19 T.C. 865 (1953). All the property that Rodney and Elizabeth owned was listed in the agreement. Since Colorado is not a community property State, there can be no argument that petitioner had a community property interest in any of this property. When Elizabeth and Rodney were married she had no money or property. During the marriage she did not work for a living and there has been no showing that she received any substantial gifts or inheritance. With the exception of the partnership interests in Ivarod Foundation and Southern Agency Co.[3] and a few items of furniture, all the property they acquired was with Rodney's earnings. The only property that Elizabeth possibly had an interest in was the family home, which had been appraised at $25,000; some stock valued at $9,000 which had been purchased by Rodney in her name; and her bank account.

Under the terms of the agreement, Rodney paid Elizabeth $12,500 for her interest in the home, she received stock valued at approximately $5,000, and she received the proceeds of her bank account. This was in addition to receiving the right to a certain portion of Rodney's insurance if he predeceased her, a car, furniture, and the monthly payments. Based on these facts, we fail to see what property petitioner contends she was being paid for or what property rights the monthly payments were in settlement of. Furthermore, there is no evidence that "property rights" were even a factor in determining the amount of the monthly payments. On the contrary, the following testimony by Rodney indicates the factors considered:

Q. I would like to have you refer to Paragraph 9 on page 4 of Exhibit 8. Have you reviewed that paragraph?

A. Yes.

Q. Did you negotiate with Mr. Van Cise [Elizabeth's attorney] concerning that paragraph?

A. Yes, sir.

Q. How did you arrive at the monthly payments of $425 a month?

---

[2] It is to be noted that the parol evidence rule is not applicable to the instant case since the Government was not a party or privy to a party to the agreement. *Thorsness v. United States,* 260 F. 2d 341, 345 (C.A. 7, 1958) ; *Landa v. Commissioner,* 206 F. 2d 431, 432 (C.A. D.C. 1953) ; *Scofield v. Greer,* 185 F. 2d 551, 552 (C.A. 5, 1950).

[3] Rodney acquired partnership interests in Ivarod Foundation and Southern Agency Co. by gift from his father and mother. There was no evidence that Elizabeth had an interest in either of these partnerships.

A. Through negotiation?

Q. What factors were considered?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A. The amount was arrived at for her support and maintenance and living expenses and the payment of taxes.

Q. Was the payment of Federal income tax considered when you arrived at that figure?

A. Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. What consideration was given to Federal income taxes in arriving at that amount?

A. Well, it was discussed. She was to pay the taxes on the amount she received.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Did you discuss that matter with Mr. Van Cise?

A. Yes, sir.

According to the agreement, Elizabeth was to receive $350 per month as long as she lived in the family house and $425 per month after she moved out. These payments were denominated "alimony" before the divorce decree and called part of the "property settlement" afterwards. Why did the labels suddenly change? Rodney supplied the answer in the following testimony:

Q. Will you explain to the Court why the payment of $425 was referred to as part of a property settlement and not alimony?

A. Because in the state of Colorado if it's a property settlement, you can't be hailed into court to have it changed, either up or down.

Q. The divorce court has no jurisdiction to raise or lower alimony?

A. The alimony they can, yes, but if it's a property settlement, they can't.

Q. And that was the reason for the insertion of that particular phrase,[4] is that correct?

A. Right.

Q. Am I correct then that your testimony is that that was for the purpose under Colorado law of foreclosing the divorce court from raising or lowering the payments?

A. That's correct.

In her divorce petition, petitioner specifically asked for alimony. Prior to the first divorce decree, she did receive alimony. While the agreement does not term the later payments alimony, it does recite that petitioner "agreed to accept the provisions hereof in full settlement for all claims for permanent alimony or support and widow's allowance." As we said in *Julia Nathan, supra,* "it would be unrealistic to hold that she gave up this right to support without consideration, and in *Hogg, supra,* the wife obviously relinquished a present legal right to support in exchange for a future contractual right to support."

On direct examination, petitioner testified that the purpose of the

---

4 The reference is to that portion of paragraph 9 of the agreement which states that "these payments not to be alimony but as part of the property settlement."

statement in paragraph 9 of the agreement [5] was that she "waived all rights to alimony or support payments in lieu of the property settlement." Petitioner also testified that the monthly payments "were a property settlement." While we have given careful consideration to petitioner's testimony, we think the preponderance of the evidence is to the contrary. Based on the record before us, we think it is clear that the agreement merely placed a different label on what was in reality alimony. We hold that the monthly payments are includible in petitioner's gross income.

## Issue 2.

The second issue is whether the 6-year statute of limitations is applicable to the taxable years 1954 and 1955. To invoke the 6-year statute of limitations provided for in section 6501(e)(1)(A),[6] the respondent has the burden of proving that petitioner omitted "from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated on the return." *Lois Seltzer*, 21 T.C. 398 (1953).

Petitioner filed her 1954 return on March 29, 1955, and her 1955 return on April 12, 1956. The statutory notice of deficiency was issued on February 1, 1960, which is within 6 years of the dates on which the returns were filed.[7]

On her Federal income tax returns for 1954 and 1955, petitioner reported gross income of $1,012.88 and $825.88 for the respective years. In each of those years, petitioner received an additional $5,100 from her former husband. Petitioner did not include these addi-

---

[5] "these payments not to be alimony but as part of the property settlement."

[6] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(e) OMISSION FROM GROSS INCOME.—Except as otherwise provided in subsection (c)—

   (1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

      (A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

         (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and

         (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item.

[7] By reason of section 6501(b)(1), the statute of limitations did not begin to run until April 15, 1955, and April 15, 1956, for the respective years in question. Section 6501(b)(1) provides:

SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(b) TIME RETURN DEEMED FILED.—

   (1) EARLY RETURN.—For purposes of this section, a return of tax imposed by this title, except tax imposed by chapter 21 or 24, filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.

tional amounts in her gross income for either year, nor did she disclose on the returns the fact that she had received these amounts. We have found that the payments petitioner received from Rodney were includible in her gross income. Since these amounts are in excess of 25 percent of the gross income shown on the respective returns, we hold that the 6-year statute of limitations is applicable to the years 1954 and 1955.

In order to take into account certain adjustments agreed upon by the parties,

*Decision will be entered under Rule 50.*