ADA M. DIXON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3239-63. Filed August 12, 1965.

*Burton R. Tauber*, for the petitioner.
*Lee A. Kamp*, for the respondent.

### OPINION

FORRESTER, *Judge:* The respondent has determined a deficiency in the petitioner's Federal income tax for 1959 in the amount of $7,205.35.

The only issue for our consideration is whether royalties in the amount of $21,406.74 are fully taxable to the petitioner as alimony or whether such payments are gifts, or are bequests subject to depreciation. Another issue raised by the pleadings has been conceded by the respondent.

All of the facts have been stipulated and are incorporated herein by this reference.

---

[3] We so held in *Cardinal Finance Co.*, T.C. Memo. 1963-24.

The petitioner, Ada M. Dixon, of Forest Hills, N.Y., timely filed her individual Federal income tax return for the year 1959 with the district director of internal revenue, Manhattan District, New York, N.Y.

The petitioner and the late Mort Dixon (hereinafter referred to as Dixon) were married on September 26, 1923. They were divorced on September 25, 1951, in the Chancery Court of Crittenden County, Ark. The decree of divorce incorporated a property settlement agreement dated May 10, 1951, which provided in material parts as follows:

FIFTH: The husband does hereby make the following provision for the support and maintenance of the wife:

\* \* \* \* \* \* \*

C. The husband, throughout his life, shall pay to the wife throughout her life, so long as she does not remarry, for the wife's maintenance and support a sum equal to 7/17ths of the husband's net income in each year, not exceeding, however, the maximum of $10,000.00 per year nor less than the minimum of $5,000.00 per year.

\* \* \* \* \* \* \*

SEVENTH: The husband is a member of the American Society of Composers, Authors and Publishers, hereinafter called ASCAP. It is the husband's desire, if he be survived by the wife, and provided that the wife has not remarried before the husband's death, that the wife shall receive 60% of the royalty payments made by ASCAP after the husband's death and for the balance of the wife's natural life. The husband therefore agrees that he will, in his last will and testament, express such a desire on his part and, the husband does further agree that he will make specific provision in his last will and testament to the effect that if his estate be elected to membership in ASCAP, 60% of the net royalty paid by ASCAP to his estate shall be paid either by his executor or directly by ASCAP to the wife for the balance of the wife's natural life.

EIGHTH: The wife accepts the provisions herein made for her in lieu of and in full settlement and satisfaction of any and all claims and rights against the husband for her support and maintenance.

\* \* \* \* \* \* \*

THIRTEENTH: Each party shall and will, at any time or times, make, execute and deliver any and all such further assurances, necessary instruments, or documents, and will perform all such other acts as the other of said parties shall reasonably require, for the purpose of giving full force and effect to this agreement and to the covenants, conditions and provisions hereof.

Dixon was a composer, and he wrote numerous popular songs during his lifetime. He applied for membership in the American Society of Composers, Authors & Publishers (hereinafter referred to as ASCAP) on February 2, 1924, was elected on May 4, 1925, and was still a member at the time of his death on March 23, 1956.

The membership agreement between ASCAP and Dixon stipulated that Dixon "sells, assigns and transfers [to ASCAP] for the term hereof" the entire exclusive right of public performance in each of his musical works and that ASCAP pay to Dixon a formulized net of royalties. Under ASCAP's articles of association, Dixon's membership was terminated by his death.

Dixon was survived by his second wife, Marion Doll Dixon. Dixon's last will and testament dated January 14, 1954 (hereinafter referred to as the will), was admitted to probate in Westchester County, N.Y. The will provided in pertinent part as follows:

THIRD: I am a member of the American Society of Composers, Authors and Publishers, hereinafter referred to as ASCAP. I request that ASCAP elect my estate to membership and in the event that my estate is so elected I direct that all royalties paid by ASCAP after my death, shall be divided among the following persons and in the following manner:

(a) If both Ada M. Dixon and Marion Lawson shall be alive at the time of my death, I direct that such royalties shall, during their joint lives, be divided, 60% to Ada M. Dixon and 40% to Marion Lawson. * * *

\* \* \* \* \* \* \*

(d) If Ada M. Dixon shall re-marry during my lifetime, such royalties shall be disposed of * * * in the same manner as if she had predeceased me, * * *

Shortly after Dixon's death, ASCAP sent questionnaires to Marion Dixon, the surviving spouse, and the executor of his estate in an immediate effort to designate a successor to the deceased member, and by an agreement dated July 15, 1957, the following persons became ASCAP members:

Marion B. Dixon, surviving spouse
Estelle Barbara Jaffee, surviving child
Yvonne Cresci, surviving child
Jack Korshin, executor of the estate of Mort Dixon.

All payments by ASCAP for the public performances of Dixon's songs which had accrued subsequent to his death and prior to the election of the successor memberships on July 15, 1957, were paid to the estate of Mort Dixon.

For the years 1945 to 1963, inclusive, ASCAP made the following payments to Dixon and the estate of Mort Dixon:

| Year | Amount received | Year | Amount received |
|------|-----------------|------|-----------------|
| 1945 | $18,709.25 | 1955 | $21,113.22 |
| 1946 | 18,478.45 | 1956 | 20,029.73 |
| 1947 | 18,889.53 | 1957 | 22,000.57 |
| 1948 | 19,265.30 | 1958 | 23,033.53 |
| 1949 | 17,303.20 | 1959 | 23,843.30 |
| 1950 | 16,861.52 | 1960 | 28,610.15 |
| 1951 | 18,300.54 | 1961 | 28,154.20 |
| 1952 | 18,090.15 | 1962 | 30,102.14 |
| 1953 | 20,814.91 | 1963 | 32,794.86 |
| 1954 | 23,123.98 | | |

In the years 1956 and 1957 petitioner received her share of ASCAP payments from Dixon's estate. For 1958 and subsequent years the petitioner's share of the ASCAP payments were made directly to her as a convenience to all parties involved. Following is a record of the

moneys received by the petitioner with respect to the ASCAP royalties, and the depreciation she claimed on her income tax return:

| Year | Royalties received | Depreciation deducted |
|---|---|---|
| 1956 | $3,000.00 | 0 |
| 1957 | 5,500.00 | 0 |
| 1958 | 23,017.21 | [1] $23,017.21 |
| 1959 | 21,406.74 | [1] 21,406.74 |
| 1960 | 14,911.10 | [1] 9,576.05 |

[1] Petitioner asserts on brief that "For estate tax purposes, the Commissioner and the estate of Mort Dixon agreed upon a [fair market value] valuation of $90,000 for the royalties which might be paid by ASCAP." The record will not support such a finding, but the assertion explains petitioner's total claimed deduction of $54,000, since such amount is 60 percent of $90,000.

In a statutory notice of deficiency dated April 10, 1963, the respondent increased the petitioner's adjusted gross income for 1959 by $21,406.74, stating that: "Royalties received from American Society of Composers, Authors & Publishers are not subject to depreciation claimed."

In 1959 the petitioner received $21,406.74 from the estate of Mort Dixon. Dixon's estate received these payments from ASCAP, an organization which collects for its members the royalties earned by their copyrighted artistic works. During 1959 the estate of Mort Dixon was a member of ASCAP.

From September 26, 1923, until September 25, 1951, the petitioner was married to Dixon. Shortly before their divorce the parties executed a separation agreement to the effect that, among other things, Dixon would insert in his will a request that his estate apply for membership in ASCAP, and that if his estate were elected to membership, 60 percent of the royalties collected by ASCAP would be paid to the petitioner for the rest of her life, provided she had not remarried prior to Dixon's death. In this same agreement Dixon further bound himself to execute and deliver any instruments or documents necessary to give full force and effect to the above provision. The petitioner accepted the provision set out above and other provisions in the separation agreement "in full settlement and satisfaction of any and all claims and rights against the husband for her support and maintenance."

Dixon performed his promise to insert such a provision in his will, and after he died, his estate applied for membership in ASCAP and was elected. The applicable paragraph of the will repeated but did not change the provision made in the separation agreement for the disposition of the royalties earned after Dixon's death. The payments made to the petitioner in 1959 were made in accordance with the terms of the separation agreement.

The petitioner did not report the sum in question as income on her Federal income tax return for 1959 on the theory that the payments

were either a gift from the estate of Mort Dixon or were depreciable earnings from a testamentary bequest. The petitioner's theories both seem to be premised upon an assumption that the separation agreement lost all effectiveness on Dixon's death.

The petitioner reasons that Dixon's promise in the settlement agreement to insert in his will a request that his estate apply for membership in ASCAP could not by itself bind the estate to so apply, and since the estate could have itself collected the royalties, or taken the business to a competitor of ASCAP, that any royalty payments made to the petitioner must be considered a gift from the estate. Her alternative theory is that the payments in question are income resulting from a testamentary bequest in the nature of an annuity, with the life of the inherited property being unascertainable because the bequest, being a catalog of popular songs, is depreciable as a wasting asset.

The respondent's theory of the case is that the settlement agreement created a binding and enforceable contract concerning payments to Ada during Dixon's life and, she remaining single, further payments to her (60 percent of the royalties in question) after Dixon's death; that all such payments therefore were based on and in discharge of a legal obligation which, because of the marital relationship, was imposed on Dixon, and are thus all [1] taxable to petitioner under section 71 (a) of the Code [2] as periodic payments.

The petitioner argues that the payments in question cannot be considered alimony because New York law does not allow alimony after the death of the husband. The petitioner misreads the applicable law. In *In re Grimley's Estate*, 107 N.Y.S. 2d 129, 132 (1951), the court held that although the obligation to pay alimony ceases at the husband's death, "the husband voluntarily may assume an obligation to provide for his wife after his death and such an agreement to provide for the wife's support for her lifetime does not terminate upon the death of the husband and binds his estate."

The characterization given payments by State law is not controlling on this Court in determining their Federal income tax consequences. Payments for support or maintenance based upon the marital relation and made under a decree of divorce or separation are treated as alimony for income tax purposes. As was said in *Laughlin's Estate* v. *Commissioner*, 167 F. 2d 828, 829 (C.A. 9, 1948) :

It will be noted that the text of the statute makes no reference to "alimony" as such, nor to payments for support or maintenance, but seems to encompass all payments made under a decree of divorce or separation in discharge of a legal obligation imposed under a decree of divorce because of the marital relationship. * * *

---

[1] Since 1959 is the only year before us we are concerned only with payments made to Ada after Dixon's death.

[2] All statutory references are to the Internal Revenue Code of 1954.

It was the court's holding that payments made by the husband's estate were deductible by the estate as periodic payments even though California law specifically prohibited alimony after the husband's death. See also *Helen Scott Fairbanks*, 15 T.C. 62 (1950), affd. 191 F. 2d 680 (C.A. 9, 1951), certiorari denied 343 U.S. 915; *Daisy M. Twinam*, 22 T.C. 83 (1954); *United States* v. *Soltermann*, 163 F. Supp. 397 (N.D. Cal. 1958).

Petitioner's approach, crucial to her theories, is that paragraph Seventh of the separation agreement does not amount to a binding and legally enforceable contract to pay her royalties accruing after Dixon's death and that, therefore, such payments to her were required or motivated otherwise. Such paragraph provides as follows:

SEVENTH: The husband is a member of the American Society of Composers, Authors and Publishers, hereinafter called ASCAP. It is the husband's desire, if he be survived by the wife, and provided that the wife has not remarried before the husband's death, that the wife shall receive 60% of the royalty payments made by ASCAP after the husband's death and for the balance of the wife's natural life. The husband therefore agrees that he will, in his last will and testament, express such a desire on his part and, the husband does further agree that he will make specific provision in his last will and testament to the effect that if his estate be elected to membership in ASCAP, 60% of the net royalty paid by ASCAP to his estate shall be paid either by his executor or directly by ASCAP to the wife for the balance of the wife's natural life.

At another point in the agreement Dixon further promised to execute any documents necessary to give full force and effect to paragraph Seventh. The petitioner accepted the provisions of paragraph Seventh along with other provisions in the separation agreement in full settlement and satisfaction of any and all claims and rights against Dixon for her support and maintenance.

Whether a written agreement amounts to a legally enforceable contract is determined by reference to State law. In the instant case it is not clear whether the law of Arkansas or New York should apply. Dixon signed the document before a public notary in Arkansas, and the petitioner's signature was notarized in New York. The instant case was tried on a complete, if imperfect, stipulation of the facts, and there is no evidence as to where the contract was drawn up or where the parties intended it to be performed. Fortunately the applicable law of both New York and Arkansas compel the decision we reach.

The petitioner argues that the provisions in question cannot amount to a binding contract because the instrument merely says that Dixon will express "a desire" in his will that his estate apply for membership in ASCAP. The petitioner reasons that the executor of Dixon's estate was free to disobey this request and collect the royalties himself or apply for membership in a competitor of ASCAP. We think this reading of the contract distorts and subverts the intention of the parties.

It is the settled policy of both Arkansas and New York to construe contracts to carry into effect the reasonable intention of the parties rather than destroy contracts because of uncertainty. *Shibley* v. *White*, 193 Ark. 1048, 104 S.W. 2d 461 (1937); *Rentways, Inc.* v. *O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E. 2d 271, 273, (1955). Equity looks to the substance, and not the form, and in construing a contract will if necessary supply any words necessary to carry out the obvious intention of the parties. *Maxwell* v. *Felker*, 148 Ark. 393, 230 S.W. 266 (1921).

When read as a whole the contract indicates that Dixon intended to bind his executor to apply for membership in ASCAP. The document provides that it is Dixon's desire that the petitioner "shall receive 60% of the royalty payments made by ASCAP after the husband's death * * *." To achieve this Dixon unequivocally "agrees" that he will express such a desire in his last will and testament. This provision when read in connection with his promise to execute and deliver all the documents necessary to give full force and effect to the instrument indicates a sufficiently clear intention on his part to bind his estate to apply for membership in ASCAP.

In determining what Dixon intended to insert in his will about the election of his estate to membership in ASCAP, a good reference source is the will itself. There is no ambiguity in the will. The applicable paragraph does not say that Dixon "desires" his estate to apply for membership; rather it states flatly that "I request that ASCAP elect my estate to membership and in the event that my estate is so elected I direct that all royalties paid by ASCAP after my death, shall be divided among the following persons and in the following manner * * *." To give effect to that paragraph it is of course necessary for the executor to apply for membership in ASCAP.

Petitioner further argues that the agreement cannot be an effective and binding contract to dispose of royalties accruing after Dixon's death because only a will can dispose of property after death. It is the established law of both New York and Arkansas that a contractual agreement to make a particular disposition of property by will is specifically enforceable in equity if supported by an adequate consideration. In New York it is recognized that a person can make a valid agreement to make a particular testamentary disposition of his property. If the person makes an inconsistent testamentary disposition of this property, the original written agreement, if supported by an adequate consideration, is specifically enforceable in equity by compelling any person, into whose possession the property affected may have come, to account for and deliver the proper share of the property to the beneficiary named in the agreement. *Rastetter* v. *Hoenninger*, 214 N.Y. 66, 108 N.E. 210 (1915). To the same effect

are *Black* v. *Hill*, 117 Ark. 228, 174 S.W. 526 (1915); *O'Connor* v. *Patton*, 171 Ark. 626, 286 S.W. 822 (1926); *McCargo* v. *Steele*, 160 F. Supp. 7, affd. 260 F. 2d 753 (C.A. 8, 1958). In the instant case there is no dispute about the adequacy of the consideration. The applicable law compels the conclusion that, if the executor of Dixon's estate had failed to apply for membership in ASCAP, he could have been compelled by a chancellor to apply. Furthermore, if the executor had paid the royalties to someone other than the petitioner, the petitioner could have recovered over.

We hold that the relevant sections of the separation agreement amounted to a binding and enforceable contract to pay the petitioner 60 percent of the royalties collected by ASCAP after Dixon's death. Dixon made a binding promise to execute a will and in that will to insert a provision requesting his estate to apply for membership in ASCAP. This contract was valid and would have been specifically enforceable in either Arkansas or New York.

The provisions in the will relating to the disposition of royalties accruing after Dixon's death did not change the petitioner's existing rights to 60 percent of such royalties. Paragraph Third of the will simply spelled out for the executor the means of carrying out the terms of the separation agreement, it did not attempt to alter the substance of said agreement.

In *Helen Scott Fairbanks*, 15 T.C. 62 (1950), affd. 191 F. 2d 680 (C.A. 9, 1951), certoriari denied 343 U.S. 915, the petitioner in 1938 had entered into a property settlement agreement with her then husband which was approved and adopted by the court which granted her a divorce. The said agreement was by its terms made binding upon the assigns, executors, and administrators of the parties and provided for monthly payments to the petitioner "to make provision for [her] support * * * during the remainder of her life." The said agreement also provided that petitioner's husband would deliver certain shares of corporate stock to a third party (trustee) as security for the performance of the agreement. About a year after the divorce the husband created and funded such trust. About a year and a half thereafter the husband died and a dispute regarding the size of the monthly payments due petitioner thereafter arose, which dispute was settled by an agreement entered into between petitioner and the executors of her husband's estate and providing that the payments to petitioner be made by the trustees of the trust. Such "settlement" agreement was entered into or at least acquiesced in by the trustees, for the required payments were made. Petitioner sought to avoid the payment of income tax upon such payments by arguing that they stemmed from the "settlement" agreement which should properly be construed to have been wholly apart from the prior property settle-

ment agreement. We held that the "settlement" agreement was one which the parties were obligated to make under the terms of the property settlement and therefore supplemental thereto. We said (pp. 68–69):

The answer to petitioner's argument is that the 1938 and the 1941 agreements are to be read together. It was provided in the 1938 agreement that each party bound his "heirs, assigns, administrators and personal representatives" to execute, at any time all agreements required for the purpose of giving full effect to the agreement. Our conclusion is that the 1941 agreement supplemented the 1938 agreement, and made provision for carrying out the chief provision thereof, i.e., the making of payments to petitioner for the remainder of her life. It did not alter the *substance* of the 1938 agreement. On the contrary, it provided for the continued carrying out of that agreement by those who were by its terms obligated to continue to make monthly payments to petitioner under Fairbanks' agreement that she would receive payments for life.

Since the 1938 agreement was incident to the divorce of petitioner from Fairbanks, and since the payments provided for by the 1938 agreement were precisely the type described in section 22(k) of the Code, the payments received by petitioner in 1942 and 1943 were not rendered any different merely because those who were bound to carry out the provisions of the 1938 agreement after the death of Fairbanks agreed upon the *method of carrying out that obligation.* The obligation which the trustees met in 1942 and 1943 in making the payments to petitioner which are in dispute here, were in discharge of a legal obligation imposed by the decree of divorce of the District Court of Nevada because of the marital relationship of Fairbanks with petitioner.

It is held that the amounts in question which were received by petitioner in 1942 and 1943 are includible in her taxable income under section 171 of the Code, and the respondent's determination is sustained. * * *

We see none but superficial differences between the facts of the instant case and those of *Fairbanks*. In the instant case the property settlement provided for certain provisions in Dixon's will and the will contained such provisions. In *Fairbanks* the property settlement agreement provided that the payments to the wife would continue for her life and this provision was implemented by the creation of the trust. In each case the compelling reason behind the payments made to the divorced wife was the property settlement agreement which had been approved and incorporated into the decree of divorce. Cf. *Beecher* v. *United States*, 280 F. 2d 202 (C.A. 3, 1960).

We conclude that the payments received by the petitioner were required by and resulted from the separation agreement which was incorporated in the decree of divorce. These payments were based on the marital relationship of Dixon and the petitioner and were in discharge of Dixon's legal obligation of support. They are taxable to the petitioner as periodic payments under section 71(a).

Because of a concession made by the respondent,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

DRENNEN, *J.*, concurs in the result.

718

MULRONEY, J., dissenting: By the agreement of May 10, 1951, decedent bound himself to make a testamentary bequest of a royalty interest to petitioner. He did just that and I would hold that petitioner, as she contends, takes under the will and not under the contract to make a will. The royalty interest received under the will would be taxable to her and I doubt if she would be entitled to the depreciation she claims. See section 273, I.R.C. 1954, and respondent's regulations thereunder.

BRUCE, J., agrees with this dissent.