BEN C. LAND, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1288–72. Filed February 25, 1974.

*Barnett M. Goodstein* and *Wade Starr*, for the petitioner.
*Richard D. Ames*, for the respondent.

GOFFE, *Judge:* Respondent determined a deficiency of $2,898.08 in the petitioner's Federal income tax for the year 1969. There are two issues for our decision: (1) Whether the petitioner, an airline pilot for Braniff Airways, is entitled to exclude under section 112(b), I.R.C. 1954,[1] a portion of the salary he received for flying civilian aircraft to South Vietnam during 1969; and (2) whether payments made by the petitioner to his former wife are deductible as alimony under section 215(a) or are in the nature of a property settlement.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Ben C. Land (herein referred to as the petitioner) was a legal resident of Dallas, Tex., when he filed his petition in this proceeding. He filed his individual Federal income tax return for the year 1969 with the district director of internal revenue at Dallas, Tex.

*Facts Relating to Claimed Combat Pay Exclusion*

Petitioner has been a pilot for Braniff Airways, Inc. (Braniff), since 1946. During the year 1969, Braniff was engaged in transporting United States military personnel and materiel to the Republic of South Vietnam. Braniff used its own aircraft and crews to carry out this contract airlift service for the United States Department of Defense.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

The flights to South Vietnam were considered preferential by the Braniff pilots since they received premium pay for making them. In order to secure these flights the pilots would bid for them on a seniority basis. For 9 months of 1969 the petitioner was able to obtain these flight assignments on a regular basis.

During these flights the petitioner wore a Braniff flight uniform as did other crew members. He was issued a "Noncombatant's Certificate of Identity" by the Department of Defense showing that he was to be deemed to hold the assimilated rank of lieutenant colonel in the United States Air Force. If he should "fall into the hands of the enemies of the United States," he was to be accorded the protocol privileges accorded military personnel of similar rank. The card was used only for identification and was not considered a pass.

Petitioner was not captured nor detained by any enemies of the United States during 1969. Nor was he at any time during that year a member of the Armed Forces of the United States. He likewise received no injury and required no hospitalization as a result of wounds incurred in any combat zone.

Petitioner received no pay or allowances directly from the United States Government. His entire salary was paid directly by Braniff. Relying on section 112, petitioner excluded from his gross income $500 per month for each of the 9 months that he flew to South Vietnam during 1969, for a total exclusion of $4,500. Respondent disallowed the entire amount claimed.

### Facts Relating to Claimed Alimony Deduction

Petitioner married Marianne Lucille Hites in 1947. From 1956 until their divorce on March 19, 1969, they resided in Dallas, Tex. During this time the petitioner's wife was not employed.

Both the petitioner and his former wife were represented by the same attorney who agreed to represent them both only so long as there was no dispute between them. The divorce decree which was signed on March 19, 1969, incorporated a property settlement agreement independently agreed to by the petitioner and his wife.

The property settlement agreement provided as follows:

A. The family home would be sold and the proceeds equally divided.

B. Various joint banking accounts were to be consolidated, community indebtedness paid, and the balance remaining was to be equally divided.

C. In exchange for her rights in the petitioner's pension fund the petitioner was to purchase an automobile for his wife.

D. Certain personal property was to be sold and the proceeds divided equally.

E. All remaining household goods had been equitably divided between the parties and each party recognized the other's sole ownership.

F. In consideration of the petitioner's assumption of sole liability on a note in the face amount of $60,000 and his promise to protect his wife from any liability thereon, his wife surrendered any and all interest she had in the stock of Utah Shale Corp. and in a parcel of real estate located in Dallas County, Tex.

G. The petitioner agreed to provide hospitalization insurance for their three children and maintain insurance on his life for the benefit of the children so long as they remained unmarried minors.

H. The petitioner agreed to endorse existing insurance on his life to his wife as well as to continue to pay the premiums thereon until the death or remarriage of his wife. The premiums were to be paid by means of a withholding from the petitioner's salary. The parties agreed "that it [was] their intention that this provision qualify under Sections 71, 72 or 215 of the Internal Revenue Code, for taxable income and deductible expenses of the parties hereto."

I. The petitioner agreed to give his wife a cash payment of $19,104 representing her community interest in the following property: Collateral securing Pritchett's Automotive Service loan; La Selva Beach, Calif., property; unimproved lot at Hideaway Lake; SMC Mutual Fund capital stock; Orrtronics, Inc., stock; a certificate of deposit in the name of Petrol Service Corp.; various antique automobiles; and certain savings accounts.

J. The parties agreed that the 50-percent stock ownership interest they jointly held in Pritchett's Automotive Service would be divided equally between them.

K. The petitioner agreed to give his wife a promissory note in the principal amount of $21,476.57 bearing interest at 6 percent per year payable in 121 monthly installments of $237 "in full and complete consideration for wife's right, title and interest in and to one certain promissory note in the remaining principal balance of approximately $2,953.15, * * * said note being secured by a lien against a residence at 11124 Dwarf's Circle in the City of Dallas, Texas; and for all of wife's right, title and interest in and to the capital stock of Petrol Service Corporation (which corporation owns a Certificate of Deposit at the Fair Park National Bank, of which wife is herein receiving her one-half interest in cash, and a 107.87 acre farm in Hunt County, Texas) ; and husband agrees that Petrol Service Corporation will give wife a Second Deed of Trust secured by the said farm in Hunt County, Texas, to secure the payment of the herein described note." This paragraph. of the agreement also contained language evidencing their intent that the payments on the note should entitle the husband-petitioner to a deduction and the money paid to the wife should constitute gross income to her.

L. The parties agreed that then-existing income tax liabilities or assets that accrued prior to December 31, 1968, would be shared equally.

M. The petitioner agreed to make payments in the amount of one-third of his net income as defined for the support of his minor children. The amount paid as support was to be reduced as the children reached the age of majority.

The property settlement agreement concluded with the statement that each party understood and agreed that the agreement granted to each other their respective property interests.

Petitioner and his wife were, at the time of their divorce, the only shareholders of Petrol Service Corp. The corporation owned at that time assets consisting of a certificate of deposit of approximately $20,000, a parcel of real property at La Selva Beach, Calif., and a 107.87-acre farm in Hunt County, Tex. The farm had been purchased in 1962 or 1963 at a price of approximately $150 per acre.

A balance sheet dated January 19, 1969, listed the farm at a value of $30,000 subject to an existing lien of $4,103 with credit given for a payment due of approximately $1,655.

This balance sheet showed a family net asset valuation of $90,185.48 which was to be equally divided between the petitioner and his wife. Petitioner was to give his wife cash in the amount of $21,852 and a note in the amount of $23,440.74.

In their negotiations the petitioner and his wife were concerned with the proper measure of support for each other. Petitioner had a tentative budget showing cash requirements of $1,370 per month. His wife's budget as drafted showed necessary expenditures of $671 per month. The tentative budget showed the following:

MARIANNE BUDGET

| | | | |
|---|---|---|---|
| Misc. | $20 | Interest | $236. 54 |
| Rent | 229 | | 100. 00 |
| Phone | 20 | | 675. 00 |
| Groceries | 200 | | |
| Laundry and cleaning | 20 | | 1, 012. 54 [sic] |
| Gas and oil | 10 | Find taxes on 236.54 mo. | |
| School | 60 | | |
| Clothes | 100 | | |
| Music | 12 | | |
| | 671 | | |

Beginning in 1969 the petitioner made 31 separate payments by check to his former wife in payment of the note. Each check was in the amount of $237. Of the 31 checks 30 bore a notation indicating it was in payment of the "Farm Note."

Petitioner claimed a deduction of $2,133 as alimony on his Federal income tax return for 1969. This was disallowed by respondent on the

ground that the payments were not for alimony but represented part of the property settlement between the petitioner and his former wife.

OPINION

## Issue 1. Combat Pay Exclusion

Section 112 of the Code provides that certain compensation received by members of the Armed Forces of the United States serving in combat zones or who are hospitalized as a result of injuries received in such zones shall not be included in gross income. Enlisted personnel below the grade of commissioned officer need not include any compensation received while performing services in a combat zone. Section 112(b) permits commissioned officers to exclude up to $500 per month as compensation received "for active service as a commissioned officer in the Armed Forces."

Petitioner, relying on his assimilated rank of lieutenant colonel in the United States Air Force, excluded $500 per month for each month that he flew to South Vietnam during 1969. Respondent contends that since the petitioner was not on active duty in military service he is not entitled to the combat pay exclusion.

There is no question that South Vietnam was a properly designated combat zone for the period in question. See Exec. Order 11216, 1965–1 C.B. 62. A commissioned officer in the Armed Forces of the United States performing precisely the services rendered by the petitioner would be entitled to the exclusion granted by section 112(b). The sticking point is that the petitioner was *not* a commissioned officer in the Armed Forces of the United States.[2] He was then and at the time of the trial herein a civilian pilot with Braniff Airways.

Several cases have involved this very issue and they have uniformly held that persons in the petitioner's circumstances were not entitled to the combat pay exclusion.[3]

Petitioner was issued a noncombatant's certificate of identity (DD Form 489) on February 21, 1967, with an indefinite expiration date. These cards were "established to meet the requirements of the Geneva Conventions to protect war victims." The cards also establish relative

---

[2] Sec. 7701(a)(15) contains the following definition:

MILITARY OR NAVAL FORCES AND ARMED FORCES OF THE UNITED STATES.—The term "military or naval forces of the United States" and the term "Armed Forces of the United States" each includes all regular and reserve components of the uniformed services which are subject to the jurisdiction of the Secretary of Defense, the Secretary of the Army, the Secretary of the Navy, or the Secretary of the Air Force, and each term also includes the Coast Guard. The members of such forces include commissioned officers and personnel below the grade of commissioned officers in such forces.

[3] See *Lee M. Prusia,* T.C. Memo. 1969–148 (appeal dismissed C.A. 9); *David D. Fagerland,* T.C. Memo. 1971–134; *Jay D. Reynolds,* T.C. Memo. 1972–84; *Noah E. Smith,* T.C. Memo. 1972–147; and *Gasche* v. *United States,* an unreported case (N.D. Cal. 1973, 31 A.F.T.R. 2d 73–1073, 73–1 U.S.T.C. par. 9559).

"military-civilian grade relationships for use exclusively in treatment of prisoners of war with due regard to grade." AF Reg. 30-20, p. 18, 32 C.F.R. sec. 809.50, p. 68 (1973 ed.). The cards are issued to those individuals authorized to accompany United States military forces in regions of war. There are several categories of persons authorized to carry such cards. Petitioner was included under the category covering "contractors, representatives, employees, and similar categories of non-Federal personnel." AF Reg. 30-20, *supra* at 19, 32 C.F.R. sec. 809.52, pp. 68-69.

The assimilated rank of lieutenant colonel held by the petitioner does not establish an employment relationship with either the issuing authority or the United States Government. The assimilated rank relationship is described by the United States Air Force Regulations as follows:

Military-civilian grade relationships are developed to conform with the pattern for advances of pay to prisoners of war established by Article 60 of the Geneva Conventions Relative to the Treatment of Prisoners of War, 12 August 1949, * * *. The development of these relationships is based largely on Congressional action in establishing grades and salaries for military and civilian employees * * *. It is not the intent of this regulation to require their use for any other purpose.

See also Department of Defense Instruction No. 1000.1 "Issuance of Identity Cards Required by the Geneva Conventions" (Dec. 31, 1964). The identification card was not a pass and was not sufficient to authorize petitioner to utilize Government facilities. The holder of such a card cannot bring himself within the purview of section 112.

By means of Pub. L. 92-279 (April 26, 1972), Congress extended certain exclusionary benefits to persons in a missing status as a result of hostile action in South Vietnam. The amendment to section 112 adding subsection (d) applies to members of the Armed Forces as well as to civilian employees as defined in 5 U.S.C. section 5561(2).

The committee report, H. Rept. No. 92-825, to accompany H.R. 9900 (Pub. L. 92-279), 92d Cong., 2d Sess. (1972), states that the bill "does not alter the general provisions contained in present law with respect to the combat pay exclusion." H. Rept. No. 92-825 at p. 2. See also S. Rept. No. 92-748, to accompany H.R. 9900 (Pub. L. 92-279), 92d Cong., 2d Sess. (1972). Because of the hardships suffered by prisoners of war, both civilian and military, the exclusion was extended to a limited class of civilian Federal employees [4]—those persons who were engaged in direct support of military operations in South Vietnam and who were in a missing status during the conflict.

Petitioner was a civilian pilot not in Federal service and who was not in a missing status during 1969. Consequently, he is not entitled

---

[4] The change in the law affects civilian employees in active Federal service. The Senate report (S. Rept. No. 92-748 at p. 3) defines such employee as "a citizen or national of the United States (or an alien admitted to the United States for permanent residence) and an employee in or under an executive agency or a military department.4" (Fn. omitted.)

to exclude any of the income he received from Braniff Airways for his flights into South Vietnam.

## Issue 2. Alimony or Property Settlement

This issue is basically factual: Were the monthly payments of $237 made by the petitioner alimony or were they part of a property settlement? If the payments were alimony, then they are deductible by him under section 215 and includable in his wife's income under section 71. If they were part of the property settlement, then they are not deductible.

Petitioner candidly admits in his brief that paragraph K of the property settlement agreement dealing with this aspect of the transaction is "somewhat ambiguous in its meaning." The language of the paragraph states initially that the note is in consideration for the wife's interest in a certain promissory note as well as for her interest in the stock of Petrol Service Corp. Standing alone, this would be sufficient to decide the matter; however, the paragraph concludes with the assertion that the intent of the parties is that the payments should qualify under section 71 as alimony payments.

Respondent takes the position that the note was given in exchange for the wife's interest in the farm in Hunt County, Tex. He draws support for his position by a reading of paragraph K of the agreement.

Where payments made by one spouse to another are in fact capital in nature they do not fall within the ambit of sections 71 and 215. The determination that a payment is capital in nature means that the receipt of the payments does not constitute income or allow the payor a deduction. *Lewis B. Jackson, Jr.*, 54 T.C. 125, 129 (1970); *Ernest H. Mills*, 54 T.C. 608, 615 (1970), affd. 442 F.2d 1149 (C.A. 10, 1971).

It is no accident that sections 71 and 215 do not use the word "alimony" in their text. Section 71 was carefully written to focus on the nature of the payment rather than its label—whether it was labeled by diverse State law or the parties. The purpose sought by such draftsmanship was to achieve uniformity in the treatment of "amounts paid in the nature of or in lieu of alimony regardless of variance in the laws of different States." H. Rept. No. 2333, 77th Cong., 2d Sess., p. 72 (1942); S. Rept. No. 1631, 77th Cong., 2d Sess., p. 83 (1942); *Taylor* v. *Campell*, 335 F.2d 841, 845–846 (C.A. 5, 1964); *Bardwell* v. *Commissioner*, 318 F.2d 786, 789 (C.A. 10, 1963), affirming 38 T.C. 84 (1962).

The State of Texas has a clearly articulated public policy against the judicial award of permanent alimony. *Francis* v. *Francis*, 412 S.W. 2d 29 (Tex. 1967); *Lodge* v. *Lodge*, 368 S.W. 2d 40, 41 (Tex. Civ. App. 1963); *McElreath* v. *McElreath*, 345 S.W. 2d 722, 747 (Tex. 1961). However, obligations assumed by one party in the nature of

support for the other spouse will be enforced under a contractual obligation rationale. *Francis* v. *Francis, supra* at 33.

Petitioner and his wife held property under community property principles. Under such a situation it is simultaneously possible to hold other property in a person's individual capacity. It is possible at a later date to prove such possession in order to avoid a distribution of such property pursuant to a divorce action and property settlement. In such a situation the burden of proof is upon the claimant to trace and clearly identify any separately held property. *Tarver* v. *Tarver*, 394 S.W. 2d 780 (Tex. 1965).

There is a statutory presumption in Texas that "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." Tex. Fam. Code Ann. sec. 5.02 (1970). This is the counterpart to Tex. Rev. Civ. Stat. Ann. art. 4619 (1960). *Higgins* v. *Higgins*, 458 S.W. 2d 498, 500 (Tex. Civ. App. 1970), stated that "In the absence of contrary proof, all property acquired by either husband or wife during marriage is presumed to be community property."

All their property was held by the petitioner and his former wife as community property except for a few hundred dollars which was the wife's separate property. No attempt has been made by the petitioner to show that any of the joint property was his separate property.

Paragraph K of the property settlement agreement begins by setting forth the petitioner's promise to give his wife a promissory note in the amount of $21,476.57 bearing interest at 6 percent per annum. The note was payable in 121 monthly installments—1 month greater than 10 years. The note was "in full and complete consideration for wife's right, title and interest in and to one certain promissory note in the remaining principal balance of approximately $2,953.15." In further consideration for the promissory note the wife agreed to relinquish all rights to her share of the stock in the Petrol Service Corp. This corporation had two assets (1) a certificate of deposit and (2) a 107.87-acre farm in Hunt County, Tex. The note was secured by a second deed of trust on the farm property which was subject to release only upon payment or substitution of other acceptable collateral.

It is at this point that the agreement provides that the "parties agree that the intent of this paragraph is to qualify the said note and the payments thereunder under Section 71 of the Internal Revenue Code."

In *Lewis B. Jackson, Jr., supra* at 129, a decree of property settlement described the payments to be made as being "in lieu of any further division of the properties owned by the parties hereto, and in the nature of permanent alimony." This Court noted that, although

the first clause suggested a property settlement and the second alimony, the tax consequences turned on "all the circumstances surrounding the divorce decree and not merely the labels used therein." *Lewis B. Jackson, Jr., supra* at 130.

Courts have recognized that there are several factors used to aid in ascertaining the intent of the parties to such an agreement. See *West* v. *United States*, 332 F. Supp. 1102, 1106 (S.D. Tex. 1971), affd. 477 F. 2d 563 (C.A. 5, 1973). Those factors we think relevant to the disposition of this case are discussed below.

The payments with respect to the note were due in all events. Neither remarriage nor death of the petitioner would cause the payments to cease. The note would have been a liability of the petitioner's estate if he had predeceased his wife. See *West* v. *United States, supra; Bernatschke* v. *United States*, 364 F. 2d 400 (Ct. Cl. 1966); *Soltermann* v. *United States*, 272 F. 2d 387, 390 (C.A. 9, 1959); *Campbell* v. *Lake*, 220 F. 2d 341, 343 (C.A. 5, 1955); *Scofield* v. *Greer*, 185 F. 2d 551, 552 (C.A. 5, 1950).

The amount due each month in payment of the note was fixed and did not vary in spite of the possibility that petitioner's income might fluctuate. A fluctuating payment indicates an intent that the payment is in satisfaction of an obligation of support. See *Bernatschke* v. *United States, supra; Ada M. Dixon*, 44 T.C. 709 (1965); *Ann Hairston Ryker*, 33 T.C. 924 (1960); *Brown* v. *United States*, 121 F. Supp. 106 (N.D. Cal. 1954).

The existence of a fixed sum due on the note strongly indicates that a property settlement was intended. *Taylor* v. *Campbell*, 335 F. 2d 841, 845–846 (C.A. 5, 1964); *Bardwell* v. *Commissioner*, 318 F. 2d 786 (C.A. 10, 1963), affirming 38 T.C. 84 (1962); *Ann Hairston Ryker, supra.*

In *McCombs* v. *Commissioner*, 397 F. 2d 4 (C.A. 10, 1968), affirming a Memorandum Opinion of this Court, the taxpayer claimed a deduction under section 215 for payments made pursuant to a promissory note he gave his former wife. The parties there had a net estate of approximately $196,000. The wife's share of the marital property was set at $90,000. In partial payment thereof the husband gave her a note for $67,000 bearing interest at 4 percent. The note was secured by a deposit of stock held by the husband. The note was payable without regard to the death or remarriage of his wife. The amount of the note was simply the remaining value of the marital estate following certain payments by the husband. No restrictions were placed upon the wife's right to transfer the note for value. Although no indication appeared of consideration being given by the parties to the wife's necessary support, as was done in the instant case, the husband's liability on the note was not contingent on his continued economic well-

being.[5] Similarly, the husband's income was not shown to be a factor in establishing the monthly payment on the note. This petitioner's income was not a factor under paragraph K of the property settlement which created the liability. However, the amount of child-support payments the petitioner was obligated to make would vary since under paragraph M these payments were a fixed percentage of his net income which did in fact fluctuate. The tentative monthly budgets showed two levels of gross income depending on whether or not the petitioner flew to South Vietnam in a given month.

The mere fact that the note payments made by the petitioner to his former wife were used for her support does not establish their legal nature. As we said in *Lewis B. Jackson, Jr.*, 54 T.C. 125, 132 (1970), where this was also argued:

To be sure, petitioner may have expected [his wife] to use the payments in issue for support. This does not mean, however, that such payments were not in satisfaction of her vested property interest.[5] [Fn. omitted.]

The farmland, the asset ultimately involved in the transfer of Petrol Service Corp. stock, was a very valuable piece of property. Petitioner put it on the market after his divorce at the price of $100,000. It is our view that his wife did not intend to relinquish her vested rights in this property for nothing. The other asset held by Petrol Service Corp. was a certificate of deposit. She received her interest in that asset by means of an immediate cash payment; thus, it was not reflected in the promissory note. It is equally implausible that the petitioner would give her a promissory note in the amount of $21,476.57 in exchange for one having a principal due of $2,953.15.[6]

We are confident that the exchange was in fact a property settlement. Petitioner's spouse was being given her rightful share of the farm. We view the final sentence of paragraph K of the property settlement agreement as merely representing the petitioner's hopes for the transaction and not a correct reflection of the law.

*Decision will be entered for the respondent.*

---

[5] We note that the tentative budget for petitioner's wife shows a projected monthly outlay of $671 while her monthly income could total as much as $1,012 after taking into account the note payment and a $100-per-month interest income presumably from invested capital.

The tentative budget shows child-support payments of $625 per month or $1,100 per month depending on whether or not petitioner was flying to South Vietnam. Either one of these sums is sufficient to meet the outlays required by his wife's budget assuming the inclusion of $100 per month in interest income.

[6] One-half of $2,953.15, the balance due on this note is $1,476.57. It is obvious that the parties contemplated that the wife's share of the 107.87-acre farm was $20,000.