ROBERT E. WILDER and JUNE WILDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent AUDREY S. WILDER, P etitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilder v. Commissioner
Docket Nos. 9195-72, 9274-72, 2947-73.
United States Tax Court
T.C. Memo 1975-42; 1975 Tax Ct. Memo LEXIS 336; 34 T.C.M. (CCH) 271; T.C.M. (RIA) 750042; February 27, 1975, Filed Jack Crenshaw and Sam I. Diamond, Jr., for the petitioners in Docket Nos. 9195-72 and 2947-73. Neilson S. Jacobs and J. Edgerton Pierson, Jr., for the petitioner in Docket No. 9274-72. Roy S. Fischbeck, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioners Robert E. and June Wilder in the amounts of $45,086.52, $30,203.28, and $34,727.75 for the calendar years 1968, 1969, and 1970, respectively. Respondent determined deficiencies in the Federal income tax of petitioner Audrey S. Wilder in the amounts of $15,509.92 and $6,485.53 for the calendar years 1969 and 1970, respectively. [1]
The parties have disposed of some of the issues by agreement, leaving for decision whether *338 the annual cash payments made by Robert E. Wilder during the years 1968, 1969, and 1970 to Audrey S. Wilder, his former wife, are includable in her gross income for such years as alimony under the provisions of section 71(a)(1), I.R.C. 1954, [2] and therefore deductible for such years by Robert E. and June Wilder pursuant to the provisions of section 215. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Robert E. Wilder (Robert) and June Wilder were husband and wife as of December 31, 1968, and during their taxable years 1969 and 1970. They were residents of Montgomery, Alabama, at the time of the filing of their petitions in this case. They filed joint Federal income tax returns for each of their taxable years 1968, 1969, and 1970 with the director of internal revenue, Southeast Service Center, Chamblee, Georgia. Petitioner Audrey S. Wilder (Audrey) was a resident of North Little Rock, Arkansas, at the time of the filing of her petition in this case. She filed her individual Federal income tax returns for each of her taxable years 1969 and 1970 with the internal revenue *339 service center, Austin, Texas. Robert and Audrey were married in Arkansas in 1940. They moved to Baton Rouge, Louisiana in 1954 where they lived together as husband and wife until they separated sometime prior to September 6, 1967, when Audrey, through her attorney, filed a legal separation suit against Robert in the Family Court in and for the Parish of East Baton Rouge, Louisiana. In this suit Audrey sought a judgment granting her a separation from bed and board, requiring Robert to pay court costs and her attorney's fees, and awarding her alimony pendente lite in the amount of $5,500 per month and a temporary restraining order enjoining Robert from disposing of or encumbering any of the community property. On September 6, 1967, the Family Court ordered the issuance of the requested temporary restraining order and directed Robert to show cause on September 18, 1967, why he should not be required to pay Audrey the sum of $5,500 per month as alimony pendente lite and why a preliminary injunction should not be issued in accord with the temporary restraining order. In a supplemental and amended petition filed with the Family Court on September 21, 1967, Audrey denied the allegations *340 of a bill of complaint which had been previously filed by Robert in the Circuit Court of Montgomery County, Alabama, praying for a decree of divorce from Audrey from that Court. This complaint filed by Robert was later dismissed. In her supplemental petition Audrey alleged that Robert was not then and had never been a resident of Alabama although Robert had represented in his complaint in the Circuit Court of Montgomery County, Alabama that he was presently residing at Montgomery, Alabama and was and had been for 3 months prior thereto a bona fide resident of the State of Alabama. Audrey prayed in her supplemental petition that an attorney be appointed by the Family Court to accept service upon Robert. On September 21, 1967, the Family Court ordered the appointment of an attorney to accept service on behalf of Robert. On November 30, 1967, Robert, through his own Louisiana attorney, filed an answer to Audrey's petition with the Family Court in which he admitted to the representation of paragraph one of Audrey's petition which was in part that he was a resident of lawful age of the Parish of East Baton Rouge, State of Louisiana. Robert had moved to Alabama in the early part of 1967 *341 and has resided there since that time. In his answer Robert asked that a judgment be rendered against Audrey dismissing her suit at her cost. Audrey filed a second supplemental and amending petition with the Family Court on January 12, 1968, asking that a temporary restraining order be issued enjoining Robert and others acting in concert with him from bothering her and an order be issued directing Robert to show cause on January 22, 1968, why a preliminary injunction should not follow in accordance therewith. Further, Audrey requested an additional temporary restraining order be issued enjoining Robert from disposing of or encumbering any of the community property during the pendency of the separation proceedings and an order directing Robert to show cause on January 22, 1968, why a preliminary injunction should not issue in accordance with the restraining order. The Family Court by an order dated January 12, 1968, granted the relief requested and further ordered Robert to show cause on January 22, 1968, why he should not be required to pay alimony pendente lite to Audrey in the sum of $5,500 per month. Audrey's and Robert's attorneys filed motions with the Family Court to withdraw *342 as counsel of record, which were both granted on January 12, 1968. Subsequently, Audrey retained other Louisiana counsel to represent her and Robert retained Alabama counsel to represent him in their marital and property dispute. Audrey filed a third supplemental and amended petition with the Family Court on January 22, 1968, requesting the appointment of persons to make an inventory and appraisal of the community property and service of citation and process upon Robert, a partition of the community property, a judgment granting a legal separation to Audrey and dissolving the community property, and extension of the relief previously requested in her second supplemental petition. The Family Court by an order dated January 22, 1968, granted Audrey's requests and extended the temporary restraining orders issued on January 12, 1968, for an additional 10-day period and ordered Robert to show cause on January 29, 1968, why preliminary injunctions should not be issued in accord with the restraining orders and why he should not be required to pay alimony pendente lite in the sum of $5,500 per month. The Family Court of the Parish of East Baton Rouge rendered a judgment on February 23, 1968, which *343 was signed on February 29, 1968, granting Audrey a separation from bed and board, ordering Robert to pay Audrey the sum of $3,250 per month as alimony pendente lite for her maintenance and support, but reserving to Robert the right to seek a reduction of the alimony award, permanently enjoining Robert from in any way disposing of or encumbering any of the existing community property, charging Robert with court costs, and charging the community assets with Audrey's attorney's fees. At Robert's request a financial statement, reflecting Robert's net worth to be $827,844 as of September 30, 1967, was prepared by certified accountants who had in the prior 11 years prepared Robert's income tax returns and personal financial statements. This statement, which was delivered in the fall of 1967 by Robert's former Louisiana attorney to Audrey's former Louisiana attorney for the purpose of effecting a property settlement, used estimated market values for the real estate assets and market quotations, when available, for the securities without considering the effect of the size of Robert's major holdings of stock. The statement showed the following: Estimated ASSETS
Market Value
Cash in Banks
$ 0
Stocks and Securities
12,078 common shares American Republic Corp. at $3.25
$ 39,254
114 common shares Century Shares Trust Mutual Fund
at $11.00
1,254
100 common shares Continental Investment Fund, Inc.
at $7.50
750
48,000 common shares First Colonial Life Insurance Co.
45,000
50,000 common shares Fidelity National Corp.
(estimate - no recent sales)
5,000
541,957 common shares First Colonial Corp. of America
at $1.25 (135,000 shares pledged)
677,434
810 common shares Holiday Hills, Inc. (estimate - no
(estimate - no activity)
50,000
138,897 common shares National American Life Insurance
Co. at $4-3/8 (127,153 shares pledged)
607,674
2 common shares Sherwood Forest Country Club
600
1 common share Bocage Racquet Club, Inc.
500
1,427,466
Notes Receivable
Richard O. Rush
$359,720
First Colonial Corp. of America
101,650
461,370
Real Estate
(1) Ranch in Blaine County, Idaho, 420 acres
(1/2)= $ 70,000
(2) 120 acres farm land near Marksville, Louisiana
(1/3)= 1,500
(3) Lot and residence on Downing Drive in Baton Rouge
25,000
(4) 4 lots in Bocage Subdivision, Baton Rouge, with residence
300,000
(5) Tract 16 and 17 Highland Road Acres, East Baton
Rouge Parish
(1/2)= 11,500
(6) 2 lots in Freeport, Grand Bahama Island
8,800
416,800
Other Assets
Cash surrender value of life insurance
$ 25,000
Machinery and equipment in Idaho ranch
(1/2)= 5,000 30,000
Total
$2,335,636
*344 Estimated LIABILITIES
Market Value
Encumbrances on real estate listed above:
(1)Republic National Life Insurance Co., Dallas,
Texas
(1/2)= $ 22,500
(2)
0
(3)
0
(4)Republic National Life Insurance Co., Dallas, Texas
105,000
(5)Capital Bank & Trust Co., Baton Rouge, Louisiana
9,200
(6)Freeport Ridge Estates, Miami, Florida
7,317
$ 144,017
Other Notes Payable:
Capital Bank & Trust Co., Baton Rouge, Louisiana
(Secured by various amounts of stock of National
American Life Insurance Co. & First Colonial Corp.
of America)
130,000
First National Bank of Dallas (Secured by National
American Life Insurance Co. stock)
45,000
First National Bank in Albuquerque (Secured by National
American Life Insurance Co. stock)
15,333
Louisiana National Bank, Baton Rouge, Louisiana (Secured
by stock of National American Life Insurance Co. and
First Colonial Corp. of America)
189,652
R.O. Rush (Payable at $25,000 per annum) (Secured by
stock of National American Life Insurance Co.)
425,000
First Colonial Corp. of America
174,351
National American Life Insurance Co.
102,511
American Public Life Insurance Co. (Secured by stock of
National American Life Insurance Co.)
15,000
Alabama National Life Insurance Co. (Secured by stock
of National American Life Insurance Co.)
200,000
Citizens National Bank (Hammond) (Secured by stock of
First Colonial Corp.)
(1/2)= 3,750
Due Internal Revenue Service (Due Now)
54,000
Miscellaneous accounts payable
9,178
1,363,775
Total
$1,507,792
*345 This statement noted that Robert was contingently liable as a guarantor or an endorser to the extent of approximately $750,000. Shares of stock of First Colonial Corporation of America (First Colonial) and National American Life Insurance Company (National American) were traded only over-the-counter. A financial statement of First Colonial which was prepared by the same accountants who prepared Robert's financial statement indicates as of December 31, 1967, loans due from Robert in the amount of $142,525 plus accrued interest in the amount of $33,307 and a note payable to Robert in the amount of $100,000 with accrued interest in the amount of $3,667. Audrey's new Louisiana counsel and Robert's Alabama counsel began negotiations to resolve the parties' marital and property dispute in late January or early February 1968. Each of these attorneys had a copy of Robert's financial statement, Audrey's attorney having received his from his predecessor, and they discussed this statement in their negotiations. Initially the attorneys conducted their negotiations by telephone, but later they met in the office of Robert's attorney in Montgomery, Alabama, the first conference occurring *346 no earlier than February 1968. During these negotiations Robert's attorney suggested that Audrey be given $400,000 cash outright which was summarily rejected by Audrey's attorney, partly due to his subjective evaluation of Robert's interest in First Colonial and National American as being worth more than the market value shown on Robert's financial statement due to the amount of control of these two corporations represented by Robert's shares of stock. The same offer had been made to the Louisiana counsel who had previously represented Audrey. In connection with the offer of $400,000 and the financial statement which reflected Robert's net worth of a little over $800,000, one of Robert's attorneys made the statement, "You can't get blood out of a turnip." The contingent liability of Robert was considered by the parties' attorneys in their negotiations. Having been furnished a copy of a proposed merger of National American with National Producers, an Arizona corporation, by Audrey's personal physician, a director of National American, Audrey's attorney knew of this proposed merger during the negotiations and as a result of a suit against Audrey by National American he was aware prior *347 to the execution of the settlement agreement that Robert had resigned as an officer and director of National American. Audrey's attorney also knew that Robert was trying to sell his shares of stock in First Colonial and National American. During one of his personal meetings with Robert's attorney, Audrey's attorney stated that he knew or thought that Robert was trying to sell his shares of stock in these aforementioned two companies. In response to this statement Robert's attorney offered no information with respect to the terms of the agreement for the sale of the shares of stock although he had represented Robert in the sales negotiations and knew that the agreement of sale had been consummated and what it provided. Audrey's attorney did not specifically ask Robert's attorney for details of the sales negotiations and did not make any investigation of the progress of the negotiations. Robert never disclosed to Audrey or Audrey's attorney that he was negotiating a sale or had sold his shares of stock in First Colonial and National American. During March 1968, Audrey's attorney discussed the value of the shares of stock held by Robert in National American with the senior trust officer *348 of the Louisiana National Bank which was the stock transfer agent for National American. At that time the current market value of the shares of stock of National American was lower than it had originally been or was at the time Robert's financial statement was prepared in the fall of 1967. This stock was listed daily in the local newspaper in the over-the-counter transactions. Audrey's attorney was aware that the market value of National American shares was continuing to decline. Audrey's attorney was not interested in having Audrey receive one of Robert's holdings of shares of First Colonial or National American but insisted that she receive cash. The financial statement of First Colonial showed that the 550,681 shares of National American which was owned by First Colonial had as of December 31, 1967, a value of $1,090,348, including "non-admitted assets" of $541,861, which was First Colonial's pro rata share of National American's unaudited book value and a value of $2,065,054 as determined from the then current quoted market value of $3.75 per share. In a letter dated April 1, 1968, Audrey's attorney offered a counter-proposal in settlement of the community property and alimony *349 dispute between the parties which provided under paragraph 1 that an irrevocable trust be created to which Robert would deposit the sum of $40,000 each year for 10 years, these payments to be secured, and further provided in part as follows: 2. Robert E. Wilder shall pay to his wife Audrey Stout Wilder for a period of ten years in addition to the trust agreement outlined above a sum equal to $30,000.00 lawful U.S. currency commencing on or before the anniversary date of each succeeding year thereafter of this agreement. Each year during the existence of this agreement, Robert E. Wilder shall be entitled to apply the interest derived from the corpus of the trust to the alimony payment for that year. Assuming therefore that the corpus of the trust yields interest at the rate of 5% per annum, the alimony payment for the first year $28,000.00 plus $2,000.00 realized as interest on the corpus of the trust in its first year, or a total of $30,000.00. Assuming economic stability, and a constant interest rate of 5%, the alimony payment by Robert E. Wilder to Audrey Stout Wilder would decrease each year at the rate of $2,000.00, with an increase in the interest yielded by the trust of $2,000.00 *350 each year. So that theoretically, in the tenth and final year Robert E. Wilder would pay to Audrey Stout Wilder the sum of $10,000.00 as alimony, and she would receive $20,000.00 as interest on the corpus of the trust. In the event that the interest in the corpus of the trust would be less than 5%, Robert E. Wilder would pay to Audrey Stout Wilder the difference necessary to reach the $30,000.00 annual alimony payment. Conversely, if the corpus of the trust yields greater than 5% interest per annum, Robert E. Wilder would receive a credit for any and all interest in excess of 5%. Further, that the said alimony payments shall be made direct to the trust department of the Louisiana National Bank of Baton Rouge, Louisiana, to be distributed to Audrey Stout Wilder in such suitable manner as is agreed upon between Mrs. Wilder and the trust department. * * * * * 5. Robert W. [sic] Wilder will convey his undivided one-half right, title and interest in and to the residence and property located on Downing Drive, Baton Rouge, Louisiana, to Audrey Stout Wilder. * * * * * 11. That Robert E. Wilder shall pay to Audrey Stout Wilder in addition to the payments outlined above in *351 one and two, on or before the commencement of this agreement, the sum of $42,000.00 lawful U.S. currency. 12. In consideration of the above, Audrey Stout Wilder will give full and final discharge to Robert E. Wilder for any and all of her right, title and interest into any and all property real and personal forming a part of the community of acquets and gains and will execute any and all necessary papers or documents in connection therewith. * * * * * Item eleven may seem to be steep and off-base unless it is placed in proper perspective that she will need money in addition that she must live on and to purchase an automobile, and a residence. This counter offer also provided for division of the furniture and household effects in the matrimonial residence and that Audrey continue to live in this residence until it was sold. An agreement was drawn up by Audrey's attorney on the basis of a draft initially proposed by Robert's attorney, but with some modifications as a result of negotiations. The amount provided for in the provision concerning periodic alimony resulted from negotiations. Audrey's attorney consulted with Alabama counsel to determine whether any of the provisions *352 of the proposed agreement were inappropriate as to form or contrary to Alabama law, since he was unfamiliar with the laws of Alabama and he believed the agreement was being executed under those laws. The agreement, which was prepared by Audrey's attorney in Baton Rouge, Louisiana, was signed by Audrey in that city in her attorney's presence and was taken by Audrey's attorney to the office of Robert's attorney in Montgomery, Alabama, where it was signed by Robert and by his attorney as witness to Robert's signature. Audrey's attorney signed the agreement attesting to Audrey's signature either at Baton Rouge or at Montgomery. It was Robert's understanding that this agreement was executed under the laws of Alabama. This agreement, dated April 12, 1968, entitled Separation Agreement and Property Settlement, which Robert and Audrey entered into and executed, provided in pertinent part as follows: WHEREAS the Wife, as Complainant, has heretofore obtained a "Judgment of Separation" in the matter entitled "Audrey Stout Wilder v. Robert E. Wilder", in The Family Court in and for the Parish of East Baton Rouge, State of Louisiana, No. 14,565, rendered on February 23, 1968, and signed on *353 February 29, 1968. In said judgment the Wife was awarded a separation from bed and board together with alimony pendente lite from the Husband with the Court reserving unto the Husband the right to enter said Court and seek a reduction or modification of the alimony pendente lite, and, WHEREAS there exists considerable doubt among the parties and their attorneys as to the validity of the alimony provisions of the said judgment, and, WHEREAS it is contemplated that the Wife will file suit for an absolute divorce against the Husband, but it is understood that in the event such a suit is filed, the Husband denies and will continue to deny that the Wife is entitled to a divorce, and, * * * * * WHEREAS the Husband and Wife have agreed to enter into an agreement concerning payments for alimony for the Wife and the respective property rights of the Husband and Wife, and, WHEREAS the Husband and Wife have agreed on all matters concerning alimony and a division of property rights, and now desire to reduce said agreement to writing, and, WHEREAS this said agreement is for the benefit and protection of both the Husband and the Wife. NOW THEREFORE AND IN CONSIDERATION OF THE *354 PREMISES, it is mutually agreed by and between the parties as follows: 1. Effective Date. This agreement shall become effective upon the entry by a Court of competent jurisdiction of a Final Decree of Divorce, granting unto the Wife an absolute divorce from the Husband, provided that the provisions of this agreement will be approved by the Court in which such proceeding has been instituted. In the absence of the granting of a Final Decree of Divorce and the approval by the Court in which such proceeding has been instituted, of the terms of this agreement, this agreement shall be void. 2. Separation of the Parties. The parties hereto shall live entirely separate and apart, and neither party shall hereafter in any way harrass, threaten, intimidate or otherwise act in any way so as to embarass [sic] or humiliate the other party. 3. Division of Property. The Husband and Wife agree that they shall effect the following division of their property rights: (a) The Husband and Wife each own an undivided one-half (1/2) interest in and to a lot and residence located at 4010 Downing Drive, Baton Rouge, Parish of East Baton Rouge, State of Louisiana. The Husband agrees upon *355 the granting of a Final Decree of Divorce to execute a warranty deed or such other form of conveyance as may be required that will effectively convey, transfer, assign, and deliver the Husband's undivided one-half (1/2) interest in and to said property. (b) The Husband and Wife each own an undivided one-half (1/2) interest in and to a lot and residence located at 2702 Windrush Way, Baton Rouge, Parish of East Baton Rouge, State of Louisiana. The Wife agrees upon the granting of a Final Decree of Divorce to execute a warranty deed or such other form of conveyance as may be required that will effectively convey, transfer, assign and deliver the Wife's undivided one-half (1/2) interest in and to said property subject to any outstanding mortgage on said property. The Husband agrees to assume and pay any outstanding mortgage on said property. The Wife shall have the peaceable use and possession of the 2702 Windrush Way residence in Baton Rouge, Louisiana, until such time as the residence is sold and the purchaser elects to take possession thereof. During this period of time, the Husband agrees to pay all reasonable expenses for the maintenance and repair of said residence including but *356 not limited to utilities, etc. Such maintenance and repair expenses are to be approved by the Husband. (c) The Husband and Wife are the owners of an undivided one-half (1/2) interest in and to two (2) certain tracts of parcels of land described as Tracts Sixteen (16) and Seventeen (17) of Highland Road Acres Subdivision, located in Section 56, T-8-S, R-2-E, Greensburg Land District of Louisiana, Parish of East Baton Rouge, State of Louisiana. The Wife agrees upon the granting of a Final Decree of Divorce to execute a warranty deed or such other form of conveyance as may be required that will effectively convey, transfer, assign and deliver the Wife's undivided one-half (1/2) interest in and to said property, subject to any outstanding mortgage on said property. (d) The Wife shall receive all of the silverware and the items of household furniture, furnishings and appliances, etc., presently in the 2702 Windrush Way residence, * * *. (e) The Husband and Wife shall each retain their personal effects. (f) The Husband agrees to establish an irrevocable trust of which the beneficiary shall be the Wife. The Trustee shall be The Louisiana National Bank of Baton Rouge, Louisiana. The *357 Husband shall deposit with the said Trustee the sum of Four Hundred and No/100 ($400,000.00) Dollars, lawful U.S. currency. The said sum of $400,000.00 shall be paid in the following manner: within fifteen (15) days after the granting of the Final Decree of Divorce, the Husband shall deposit with the Trustee the sum of Forty Thousand And No/100 ($40,000.00) Dollars, lawful U.S. currency, and an equal and like payment of $40,000.00 on or before the first (1st) day of May of each succeeding year for a period of ten (10) years. To secure the payment of the said $400,000.00, the Husband shall at all times provide to the Trustee good and sufficient collateral to be approved by the Trustee. * * * The Husband shall not pay interest on the unpaid balance of the principal sum of $400,000.00. The Husband agrees to furnish and provide to the Trustee, an insurance policy on his life, sufficiently and adequately providing for the payment of the unpaid balance of the aforesaid principal sum of $400,000.00 in the event of the death of the Husband. * * * The Wife agrees to draw all of the income yielded from the trust on or before the first (1st) day of April of each year that the trust is in effect *358 in order that the provisions of paragraph four (4) of this agreement can be implemented. Upon the expiration of the trust, the Trustee shall pay over to the Wife, her heirs and assigns, as the case may be, the entire corpus of the trust, free and clear of the terms thereof. The obligations to pay to the trust hereinabove provided are unconditional, and if any not be paid when due, the Trustee may without further notice declare the entire balance then due and shall be free to sue thereon or take whatever steps and actions it deems necessary to collect same in any Court having jurisdiction of such claims. 4. Periodic Alimony. In addition to the above, the Husband agrees to pay to the Wife, while both the Husband and Wife shall be living, periodic alimony as follows: (a) As periodic alimony for and during the first year after the granting of a Final Decree of Divorce, the sum of Sixty Thousand And No/100 ($60,000.00) Dollars, lawful U.S. currency. Such sum shall be paid simultaneously with the first payment of Forty-Thousand And No/100 ($40,000.00) Dollars into the trust as hereinabove provided. (b) As periodic alimony for the second year, the Husband shall pay to the Wife the *359 sum of Fifty Thousand And No/100 ($50,000.00) Dollars, lawful U.S. currency, less any amounts that the Wife shall have derived during the preceding year as income from the trust hereinabove established. Such payment shall be due and payable on or before the first (1st) day of May, 1969. (c) As periodic alimony for the eight (8) succeeding years, the Husband shall pay the sum of Thirty Thousand And No/100 ($30,000.00) Dollars, lawful U.S. currency, each year, less any amounts derived by the Wife during each preceding year as income from the trust hereinabove established. Such payments shall be made on or before the first (1st) day of May of each year, with the final payment being due and payable on or before the first (1st) day of May, 1977. (d) It is agreed that the aforesaid periodic alimony payments shall cease in the event of the death of either Husband or Wife. It is also agreed that the aforesaid periodic alimony payments shall not cease in the event that the Wife remarries during the term of this agreement. It is further agreed that after the said ten (10) annual periodic alimony payments have been made, the Husband shall have no further obligation to support or pay alimony *360 to the Wife. 5. Discharge of Husband's Obligation. The Wife has given to her Husband full and final discharge for any and all of her right, title and interest in and to any and all property, real, personal or mixed which she heretofore had or which may hereinafter accrue. The Wife has further discharged the Husband from any choses in action, claims or rights accruing under that action entitled "Audrey Stout Wilder v. Robert E. Wilder", on the docket of The Family Court in and for the Parish of East Baton Rouge, State of Louisiana, No. 14,565. * * * * * The household furnishings that Audrey received pursuant to the agreement included furniture from their living room, foyer, dining room, den, kitchen, patio, sewing and sitting rooms, powder room, and two bedrooms. In January 1968, while president and chairman of the board of directors of First Colonial and National American, Robert, with the assistance and participation of three individuals, each a director of both of the aforementioned companies, began negotiations with National Securities, Inc. (National Securities), for the sale and purchase of Robert's shares of stock of First Colonial and National American. These *361 shares had been acquired by Robert at or subsequent to the incorporation of these two aforementioned companies in 1955. Robert entered into a conditional agreement dated January 24, 1968, with National Securities for the sale and purchase of not fewer than 540,000 shares of common stock of First Colonial and not fewer than 130,000 shares of common stock of National American for the sum of $5 million which was to be paid as follows: (1) $350,000 at the closing; (2) $650,000 on or before February 24, 1968; and (3) a promissory note of National Securities in the principal amount of $4 million which would be secured by the shares of stock sold and payable in ten equal annual installments with interest at the rate of 4 percent per annum. The first installment was payable on March 1, 1969. A condition of the agreement was that Robert release the two aforementioned companies from their employment contract with him which at that time had 10 years to run at an annual salary of $77,000 and resign his positions as an officer and director of the two companies. Further, Robert was required to assume indebtedness which was not shown on his financial statement. This agreement was subject to verification *362 of the financial statements of both First Colonial and National American. Pursuant to this agreement of sale and purchase of Robert's shares of stock, on February 14, 1968, National Securities paid the sum of $350,000 and delivered its promissory note in the principal amount of $4 million to Robert's attorney for Robert's account. First Colonial accepted National Securities' credit in substitution and discharge of Robert's obligations to it in the amount of $167,525. Similarly, Alabama National Life Insurance Company (Alabama National) accepted National Securities' credit in substitution and discharge of Robert's obligations to it in the sum of $202,234.48. On February 14, 1968, a meeting was held of the directors of First Colonial and National American and on that date Robert announced his resignation as president and chairman of the board of each company, the sale of his shares of stock in the two companies, and the amount of purchase price he received for these shares. Audrey's personal physician, who was a director of each of these companies, was present when Robert made these announcements. Between February 14 and 25, 1968, National Securities paid the sum of $280,240.52 to *363 Robert's attorney for Robert's account. The cash disbursements for Robert's account by National Securities aggregated $630,240.52. The release of Robert's obligations to First Colonial in the amount of $167,525 and to Alabama National in the amount of $202,234.48 amounted to $369,759.48. Consequently, as of February 25, 1968, National Securities had paid for the account of Robert or had caused Robert's creditors to discharge him of his obligations to them in the total amount of $1 million and had delivered to him its note in the amount of $4 million. The cash sum of $630,240.52 that was paid by two installments to Robert's attorney on Robert's behalf was contemporaneously disbursed to Robert and to various financial institutions in satisfaction of Robert's obligations with respect to liabilities that had been in existence prior to September 30, 1967. These disbursements were as follows: First installment on February
14, 1968
Capital Bank and Trust Co.
$118,209.08
Louisiana National Bank
168,154.13
Certificate of Deposit,
Capital National Bank
50,000.00
Trust account of Robert's
attorney
13,636.79
$350,000.00
Second installment as of February
25,1968
First National Bank of
Dallas
$ 45,788.13
First National Bank of
Albuquerque
23,058.92
American Public Life
Insurance Co.
15,837.47
Robert E. Wilder
195,556.00
280,240.52
Total
$630,240.52
*364 Part of the payment to the Louisiana National Bank was in satisfaction of a note dated January 29, 1968, in the principal amount of $75,000. The payment to First National Bank of Albuquerque was in satisfaction of two notes dated November 29, 1967. Robert incurred legal, travel, and telephone expenses in the amount of $32,771.86 in connection with the sale of his shares of stock of First Colonial and National Securities. Robert's and Audrey's two married adult children, both of whom lived in Baton Rouge, knew of Robert's sale of his shares of stock of First Colonial and National American prior to April 12, 1968, and the amount of the purchase price. Pursuant to the agreement for purchase and sale of his shares of stock dated January 24, 1968, Robert delivered to National Securities 541,157 shares of First Colonial and 113,735 shares of National American. As a result of Robert's failure to deliver the total number of shares of National American he had agreed to sell to National Securities and of the discovery of the mutual mistake of Robert and National Securities in relying on an inaccurate financial statement of First Colonial as of December 31, 1967, Robert and National Securities *365 entered into a modification in August 1968 of their original agreement for the sale of Robert's shares of stock of the aforementioned two companies. In this subsequent agreement, entitled "First Modification of Agreement for Purchase of Stock," the parties agreed that the purchase price would be reduced from the sum of $5 million to $3,350,000 to which the amount of $1 million was credited as already having been paid, leaving a balance in the amount of $2,350,000. In substitution for and surrender of the note for $4 million previously given and delivered, National Securities agreed to execute and deliver to Robert its promissory note in the amount of $2,350,000 which was to be secured by the shares of stock that had previously been sold to it. The note was to be payable in ten equal annual installments of $235,000 each with interest at the rate of 4 percent per annum on the unpaid balance. The first annual installment was to be paid on March 1, 1969. Robert further agreed to accept, in lieu of the promissory note in the principal amount of $2,350,000 which was to be delivered to him, a premium income debenture of Alabama National in the same principal amount, should Alabama National *366 issue it to him, and to release the shares of stock of First Colonial and National American which were pledged as security for the payment of the note. Subsequently the notes were exchanged but Alabama National, instead of issuing a premium income debenture to Robert, issued one to National Securities. This debenture was then substituted as collateral for the shares of stock which had been sold that were pledged as security for the payment of the new note of National Securities. Robert or his assignees received two payments in the amount of $235,000 plus interest on this note. National Securities and Alabama National have become insolvent. Robert has recovered a judgment for the remaining balance due on the promissory note of National Securities in the United States District Court for the Northern District of Georgia against Norris Grain Company (Norris) which had assumed payment of the note. This judgment was affirmed by the United States Court of Appeals for the Fifth Circuit. Although Norris is financially able to pay this judgment, the collection of this judgment has been enjoined by judicial actions instituted by First Colonial through its trustee-in-bankruptcy and Norris, and *367 Robert has not received any payment of the judgment. Robert has sought relief of the restraints imposed on him in the collection of this judgment from the United States Court of Appeals for the Fifth Circuit. On September 11, 1972, American Benefit Life Insurance Company (American Benefit) filed a petition in the United States Court of Appeals for the Fifth Circuit seeking an order requiring the issuance of a preliminary injunction restraining Robert from executing upon a judgment rendered in his suit against American Benefit in the Circuit Court of Montgomery County, Alabama. In this petition it was alleged that Robert had brought a declaratory action to determine his rights under a contract executed between American Benefit and Norris under which American Benefit assumed certain obligations of Norris to Robert. In order to determine the obligations of each to the other under the note of National Securities, which Norris had contractually assumed, under a contract between American Benefit and Norris, and under a contract between Superfine Oil and Gas Company (Superfine), American Benefit, and Norris, in 1973 American Benefit, Superfine, and Norris instituted an interpleader action *368 in the United States District Court for the Middle District of Louisiana against, among others, Robert, Audrey, National Securities, and First Colonial through its trustee-in-bankruptcy. In this complaint the allegation is made that Audrey has filed one or more suits against Robert in the Louisiana Court claiming an interest in the note given to Robert based upon an alleged fraudulent settlement of matrimonial property rights. Prior to April 1, 1968, Robert had asuumed a liability of Wilson P. Abraham on a promissory note executed by him on May 13, 1966, in the principal amount of $169,837.50 which was subsequently purchased by First Colonial on February 17, 1967, for the principal amount plus accumulated interest of $8,569.90, making a total of $178,058.55 on which the accrued interest as of March 31, 1968, was in the amount of $12,964.98. On April 1, 1968, Robert sold 10,683 shares of common stock of National American to First Colonial for $42,732 at the rate of $4 per share. As of April 1, 1968, Robert was indebted to First Colonial in the amount of $36,205.24 on account of interest accrued as of February 14, 1968, on an open account indebtedness in the principal amount of *369 $167,525.37, which principal amount had been paid on February 14, 1968. As of April 1, 1968, Robert was obligated to National American on an open account in the amount of $99,627.19, on an account receivable to Holiday Hills, Inc., in the amount of $6,786.90, on a mortgage to Holiday Hills, Inc., in the total principal balance plus accrued interest of $15,307.20, and on a mortgage to Robert's and Audrey's son in the total principal balance plus accrued interest of $25,752.05. In April 1968 a bill of complaint was filed by Audrey in the Circuit Court of Montgomery County, Alabama, seeking a divorce from Robert, the ratification and confirmation in all respects of the separation agreement dated April 12, 1968, made between the parties, and an order directing the parties to abide by its terms. The complaint bill had been prepared by Robert's attorney, was signed by Audrey's attorney at the time the separation and property settlement agreement was executed in the office of Robert's attorney, and then filed by Robert's attorney in Audrey's behalf. Robert filed an answer and waiver of service in the divorce proceedings. On April 26, 1968, the Montgomery County Circuit Court entered a *370 Final Decree of Divorce, having heard the testimony of Robert. The decree granted Audrey an absolute divorce from Robert, directed Robert to pay the court costs, and decreed "that the Separation Agreement entered into by and between the Parties on the 12th day of April, 1968 and filed in this cause, be, and the same is hereby approved and that the Parties be and they are ordered to abide by the terms thereof." As of November 27, 1973, no action has been taken or proceedings begun by either party to set aside this judgment. Robert as of that time had not been asked to agree to a recision of the agreement and had not been offered a return of the benefits received by Audrey under the settlement agreement. By letter dated April 24, 1968, a copy of which was delivered to Audrey's attorney, National Securities informed the bank trustees that it guaranteed performance of Robert's obligation pursuant to the settlement agreement to pay into a trust account of the Louisiana National Bank for the benefit of Audrey the amount of $40,000 annually for each of 9 years with the first payment due April 30, 1969. On August 23, 1968, Edwin J. Herpich, Audrey's personal physician, on behalf of all *371 stockholders of National American, filed suit against Robert and National American in the United States District Court for the Middle District of Alabama claiming causes of action for the alleged wrongful and improper acts by Robert prior to February 14, 1968, including those with respect to the sale of his shares of stock of First Colonial and National American, and praying judgment against Robert for $5 million damages. This suit was subsequently dismissed without prejudice to National American's filing suit. On January 17, 1969, a suit on behalf of the stockholders of Alabama National was filed against Robert, National Securities, and others in the United States District Court for the Northern District of Alabama, claiming causes of action for the alleged wrongful and improper acts done by Robert prior to February 14, 1968, including those with respect to the sale of his shares of stock of First Colonial and National American and the ultimate purchase by Alabama National of these shares and praying judgment against Robert for $5 million. On January 24, 1969, a suit on behalf of the stockholders of First Colonial was filed against Robert, National Securities, and others in the *372 United States District Court for the Northern District of Alabama, claiming causes of action for the alleged wrongful and improper acts done by Robert prior to February 14, 1968, including those in connection with the sale of his shares of stock of First Colonial and National American and praying judgment against Robert for $3 million. On February 3, 1969, a suit on behalf of the stockholders of Alabama National was filed against Robert, National Securities, and others in the United States District Court for the Northern District of Alabama, claiming causes of action for the alleged wrongful and improper acts done by Robert prior to February 14, 1968, including those relating to the sale of Robert's shares of stock in First Colonial and praying judgment against Robert for $5 million actual damages plus $5 million punitive damages. On or about May 15, 1969, a suit by Edwin J. Herpich on behalf of the stockholders of National American was filed against Robert, National Securities, and others in the District Court in the Parish of East Baton Rouge, Louisiana, claiming causes of action for the alleged wrongful and improper acts done by Robert prior to February 14, 1968, in connection *373 with the sale of his shares of stock of First Colonial and National American and praying judgment against Robert for $5 million. On January 15, 1970, a suit on behalf of the stockholders of Alabama National was filed against Robert, National Securities, and others in the Circuit Court of Jefferson County, Alabama, claiming causes of action for the alleged wrongful and improper acts done by Robert and praying judgment against Robert for $5 million actual damages. On January 5, 1972, National American filed suit against Robert in the United States District Court for the Eastern District of Louisiana, claiming causes of action for the alleged wrongful and improper acts, other than the sale of his shares of stock of First Colonial and National American, done by Robert prior to February 14, 1968, and praying judgment against Robert for $1,745,095.11. On March 23, 1972, First Colonial filed suit against Robert in the United States District Court for the Eastern District of Louisiana, claiming causes of action for the alleged wrongful and improper acts done by Robert prior to February 14, 1968, one of which involved the sale of his shares of stock of First Colonial and National American, *374 and praying judgment against Robert for $3,400,000. In 1972 First Colonial, through its trustee-in-bankruptcy, filed suit against Robert in the United States District Court for the Middle District of Louisiana, claiming causes of action for alleged wrongful and improper acts, other than the sale of his shares of stock of First Colonial and National American, done by Robert prior to February 14, 1968, and praying judgment against Robert in the aggregate amount of $2,481,149.20. In all of these suits filed against Robert, he has denied the allegations made against him and as of the date of the trial of this case on November 27, 1973, there had been no judgment rendered against him. By letter dated April 9, 1969, Audrey's attorney requested Robert's attorney to ask Robert to forward the second alimony and trust installments due May 1, 1969, to him so that he, Audrey's attorney, might transmit them to Audrey and the bank trustee. Pursuant to paragraph 4 of the Separation Agreement and Property Settlement approved by the final decree of divorce, Robert paid Audrey the sum of $60,000 in 1968, $47,600 in 1969, and $24,400 in 1970. These amounts were deducted as alimony payments by *375 Robert and June Wilder in their joint Federal income tax returns for their calendar years 1968, 1969, and 1970, respectively. These amounts were not included by Audrey in her individual Federal income tax returns for the calendar years 1969 and 1970. The amount of $60,000 was included by Audrey in her original return for 1968 but later she filed an amended return excluding the $60,000 and claimed the resultant reduction in tax as a refund. Pursuant to paragraph 3 of the agreement, Robert deposited with the Louisiana National Bank, the trustee for Audrey's trust account, the sum of $40,000 for each of the years 1968, 1969, and 1970. These amounts were not deducted by Robert and June Wilder in their tax returns for the calendar years 1968, 1969, and 1970, nor included by Audrey in her returns for these respective years. Respondent in his notices of deficiency disallowed the deduction claimed by Robert and June Wilder in their returns for the calendar years 1968, 1969, and 1970, for the payment of $60,000, $47,600, and $24,400 [3] made during these respective years to Audrey as "it has not been established that this payment represents a payment of alimony," and "that such amounts constitute *376 alimony payments rather than payments made in property settlement." In his notice of deficiency to Audrey, respondent increased her taxable income in the amount of $47,600 for the calendar year 1969 and $24,400 for the calendar year 1970 for payments received by her from her former husband during these respective years as "[this] income is taxable under the provisions of section 71 of the Internal Revenue Code." OPINION Section 71(a)(1)[4] and the regulations thereunder, sections 1.71-1(b)(1)(i) and 1.71-1(b)(4), Income Tax Regs., provide that if a wife is divorced or legally separated from her husband she must include in her gross income periodic payments received by her after a decree of divorce or of separate maintenance in discharge of a legal obligation, arising out of the marital relationship in recognition of the general obligation to support, and imposed on or incurred by the husband under a court order or decree divorcing *377 or legally separating the husband and wife or under a written instrument incident to such divorce or separation. Section 215(a) [5] provides that a husband may deduct from his taxable income such periodic payments included under section 71 in the gross income of the wife. However, where there is a division of property of the parties to a divorce and the husband as part of a general settlement between them makes payments in satisfaction of the wife's property rights, the amounts received by the wife are capital in nature and are neither includable in her gross income under section 71 nor deductible by the husband under section 215. Lewis B. Jackson, Jr.,54 T.C. 125, 129 (1970); William C. Wright,62 T.C. 377, 389 (1974), on appeal C.A. 7, December 12, 1974; section 1.71-1(c)(4), Income Tax Regs.
*378 There is no dispute between the parties with respect to the $40,000 annual payments in 1968, 1969, and 1970 which were designated in the agreement as part of the division of property and deposited by Robert to Audrey's trust account with the Louisiana National Bank. Robert and June Wilder did not deduct these amounts in their tax returns for the years in which they were paid and Audrey did not include them in her taxable income for these respective years and respondent does not contend that either party incorrectly treated these payments. The issue here is with respect only to the payments by Robert to Audrey provided for in paragraph 4 of the agreement in the amounts of $60,000, $47,600, and $24,400 for the years 1968, 1969, and 1970, respectively. Audrey contends that these payments are not includable in her taxable income pursuant to section 71(a)(1) because they were not in discharge of a legal obligation imposed on Robert under a decree of divorce or a "valid" written instrument incident to divorce. Relying on Murphy v. Murphy,138 Col. 516, 335 P. 2d 280 (1959); Burke v. Burke, 32 D. Ch. 320, 86 A. 2d 51 (1952); and other cases *379 from states other than Alabama, Audrey urges that the approval and incorporation by reference of the agreement in the divorce decree by the Alabama court does not make the terms of the agreement an order of the court as the terms of the agreement were not specifically and fully set forth in the decree. Audrey argues that the legal rights of the parties rest wholly on the agreement, there being no merger of the provisions of the agreement, other than the payment of monies, into the final decree. She contends that the agreement is invalid under both Alabama and Louisiana law as it was procured by fraud. Audrey in the alternative contends that these payments were in fact consideration for her interest in the community property although the payments were described in the agreement as "periodic alimony." She points out that we have in a number of cases held that whether payments by a husband to his former wife are alimony or for her release of her property rights depends upon all the surrounding facts and not on the labels used in the agreement or decree. Robert contends that he assumed a legal obligation to make the payments to Audrey under the separation agreement and that the Alabama *380 divorce decree which approved the agreement specifically imposed on him the obligation to make the payments he had assumed under that agreement, the contractual rights of the parties becoming merged into the decree. In any event Robert contends the agreement is valid. He contends that even if any misrepresentation was made to Audrey or her attorney, which he does not concede to be shown by the facts, the agreement is not void but voidable and Audrey has elected to affirm the agreement and sue in deceit for damages rather than seek recision of the agreement and return the benefits she received under the agreement. Further, he contends that the aforementioned payments were unambiguously designated as "periodic alimony" under the agreement and were intended by the parties thereto to be alimony. Respondent on brief argues in favor of Robert and against Audrey. He contends the payments in dispute were made by Robert because of the marital relationship in recognition of his general obligation to support Audrey and were in discharge of a legal obligation imposed upon or incurred by Robert under the divorce decree, the agreement being merged into the divorce decree, or under a valid written *381 instrument incident to the divorce, there being no fraud. Under the agreement the payments, to be made only over approximately 9 years, were to terminate on the death of either Robert or Audrey. The payments therefore meet the first of the two requirements of section 1.71-1(d)(3)(i), Income Tax Regs., [6] that the payments be periodic. Whether these payments meet the second requirement of this section of the regulations that the payments be in the nature of an allowance for support, is the issue between the parties. The parties recognize that to be taxable to Audrey and deductible by Robert the payments must be made in discharge of a legal obligation arising out of the marital or family relationship and that the requirement that he make the payments must be judicially imposed on Robert by a decree of divorce or voluntarily incurred by him under a written instrument incident to divorce. Ruth E. Kern,55 T.C. 405, 407 (1970). *382 Audrey relies on cases from jurisdictions other than Alabama for her argument that the divorce decree did not impose an obligation on Robert to make the payments and that no such obligation is incurred by an invalid agreement. Irrespective of whether or not the agreement imposed a legal obligation on Robert to make the payments at issue herein, in our view under Alabama law it is clear that the payments made to Audrey by Robert pursuant to their agreement which was incorporated into the Alabama divorce decree were judicially imposed on Robert under the decree by the Alabama court. Therefore these payments were imposed by the divorce decree within the meaning of section 71(a)(1). See Sullivan v. Sullivan,215 Ala. 627, 111 So. 911 (1927); Barnett v. Barnett,238 Ala. 678, 193 So. 171 (1939); and Block v. Block,281 Ala. 214, 201 So. 2d 51 (1967). The divorce decree approved the agreement and ordered the parties to abide by its terms. One of the terms of the agreement was that Robert pay the amounts at issue here to Audrey. Therefore, even if Audrey was induced to sign the agreement by fraud, the divorce decree is still *383 a valid decree and it is the decree that required Robert to make the payments. See William M. Joslin, Sr.,52 T.C. 231 (1969), aff'd. 424 F. 2d 1223 (C.A. 7, 1970). Audrey has not in any way attacked the divorce decree or petitioned the Alabama court to change any of the provisions with respect to Robert's payments to her. The facts here are in no way comparable to those in Ada M. Dixon,44 T.C. 709 (1965), on which Audrey relies. In that case, under an agreement incorporated into a divorce decree a husband provided for royalty payments on some of his work to be made to the wife after his death. The issue was whether the payments received by the wife after the death of the husband were received under an agreement incident to a divorce or under a will. We held that the agreement in light of State law required the payments and that therefore the payments were taxable to the wife under section 71(a). Having determined that the agreement was a legally enforceable contract under State law, this Court did not discuss whether the divorce decree which approved and incorporated the agreement also imposed a legal obligation on the husband's estate *384 to make the payments, since section 71(a)(1) requires only that a legal obligation to pay alimony be either judically imposed or voluntarily incurred under an agreement incident to a divorce, but not both. Under the facts of the instant case it is unnecessary to determine under the State law the rights of the parties under the agreement, as Robert had the legal obligation to make payments to his former wife by the decree of the Alabama divorce court which had ordered him to comply with the provisions of the agreement. See and compare Allen Hoffman,54 T.C. 1607 (1970), aff'd. per curiam 455 F. 2d 161 (C.A. 7, 1972); Martha K. Brown,50 T.C. 865 (1968), aff'd. per curiam 415 F. 2d 310 (C.A. 4, 1969). The divorce court had jurisdiction of the parties and the subject matter. Norris v. Norris,224 Ala. 678, 141 So. 672 (1932). Its final valid decree, having determined the legal rights of the parties with respect to the payment of "periodic alimony" is conclusive on each of the parties thereto since it has not been set aside or its execution enjoined on equitable grounds. Audrey's alternative contention *385 that, if Robert did have a legal obligation to pay the amounts provided for in paragraph 4 of the agreement, the payments were to be made to compensate Audrey for her alleged substantial interest in their marital property and not as alimony for her support raises a fact question. The determination of whether the payments in fact are to support Audrey or are in consideration of Audrey's interest in the community property must be based on all the surrounding facts and circumstances. The label that has been assigned to the payments to a spouse in an agreement of the parties or in a divorce decree is not conclusive. Wilma Thompson,50 T.C. 522, 525 (1968). Some of the factors to be considered in determining the nature of the payments include (1) the intent of the parties; Phinney v. Mauk,411 F. 2d 1196 (C.A. 5, 1969); (2) the continuation or cessation of the payments in the event of the wife's death or remarriage; McCombs v. Commissioner,397 F. 2d 4, 7 (1968), affirming a Memorandum Opinion of this Court; (3) the presence or absence of a fixed amount to be paid; Bardwell v. Commissioner,318 F. 2d 786, 789 *386 (C.A. 10, 1963), affirming 38 T.C. 84 (1962); (4) the negotiations preceding the divorce; Marion R. Hesse,60 T.C. 685, 692 (1973); and (5) whether the wife has been otherwise adequately compensated for the relinquishment of her property interest, if any, other than her inchoate rights in her husband's property; William C. Wright,supra;William M. Joslin, Jr.,supra;Wilma Thompson,supra;Walter H. Weiner,61 T.C. 155 (1973), on appeal (C.A. 2, February 1, 1974). Cf. Edith M. Gerlach,55 T.C. 156 (1970). From the facts shown in the record in this case, we consider it clear that the parties intended the payments of $60,000, $47,600, and $24,400 by Robert to Audrey in 1968, 1969, and 1970, respectively, to be payments for her support in discharge of a legal obligation which was imposed on Robert because of the marital relationship. The record also shows that these payments were to cease in case of Audrey's death. The negotiations preceding the divorce clearly indicate that these payments were for Audrey's support. Audrey's attorney in his counter offer *387 asked for $30,000 a year for 10 years less the interest Audrey received on the trust as alimony for Audrey. He later, in his offer, referred to these $30,000 payments being money she "must live on." The indication from the record is that the extra $30,000 in 1968 and $20,000 in 1969 was in replacement of a payment of $42,000 at the time of the divorce asked for by Audrey's attorney to enable Audrey to buy a house and an automobile, both items in the nature of support. The amounts to be paid were not fixed, not only because they would cease on the death of either Robert or Audrey but also because the amounts were to be reduced by the interest income Audrey received, again an indication of support payments. The record is not completely clear as to whether Audrey had been otherwise adequately compensated for her one-half of the community property. In Walter H. Weiner,supra at page 158, we stressed the importance of the factor of whether the wife had been otherwise adequately compensated for her property in determining whether an amount labeled as "alimony" in the agreement and stated by the parties to be for the wife's "support and maintenance" were in fact to *388 be considered as support payments taxable to the wife and deductible by the husband, or were to be considered as "attributable to property which originally belonged to the wife." In the instant case it appears that Audrey's attorney considered the $400,000 trust established for Audrey plus the residence and the household furnishings received by Audrey to adequately compensate Audrey for her one-half of the community property. The record shows that unless the sale by Robert of National American and First Colonial stock resulted in a price for that stock in excess of its market price determined from quotations, the amount received by Audrey was approximately half of the value of the community assets. The financial statement as of September 1967 showed total community assets of about $828,000 less whatever amount should be assigned to Robert's contingent liabilities stated to be $750,000. The record further shows that the quoted market price of National American stock had dropped from the time of the statement to the time the property settlement was entered into by approximately 65 cents a share which, if a valid measure of the value of the shares, would mean a decrease in the value *389 of the community assets by about $90,000 to approximately $728,000. Therefore, unless the shares of National American and First Colonial had a value well in excess of their quoted market price because of the conditional sale Robert had made of these shares, Audrey was compensated for her one-half of the community assets by the amounts she was to receive under the Separation Agreement and Property Settlement apart from the payments designated as "periodic alimony." On the state of this record we are not able to determine whether as of the date the parties entered into the Separation Agreement and Property Settlement Robert's conditional sales agreement for the stock resulted in a greater value to that stock than its listed market price. The agreement provided that it was subject to verification of various financial statements and in fact the price was later reduced by $1,650,000. Robert gave up a contract for 10 years' employment at $77,000 a year as part of the sales agreement. Robert assumed liabilities in partial fulfillment of the agreement for the sale of stock, the amounts of which are not fully shown in the record. We have set forth in our facts some of the liabilities which *390 he assumed which are shown in the record. The amount to which Robert is entitled under the contract for the sale of National American and First Colonial stock was the subject of much litigation at the time of the trial of this case, both State and Federal, apparently including a suit by Audrey to obtain part of the proceeds of the sale on the ground of an alleged fraudulent matrimonial settlement. In this state of the record we find no basis to conclude that Audrey has not been adequately compensated for her property rights even though at the conclusion of all the litigation Audrey might be successful in showing by evidence not present in this record that she has not been. Therefore, since all other indications in the record are that the $60,000, $47,600, and $24,400 paid by Robert to Audrey in 1968, 1969, and 1970, respectively, were payments for her support in discharge of an obligation arising from the marital relationship imposed on Robert by a divorce decree, we conclude that these amounts are includible in Audrey's income under section 71(a) and deductible by Robert under section 215. Decisions will be entered under Rule 155.
Footnotes
1. Respondent has taken an inconsistent position with respect to his deficiency determinations against petitioners Robert E. and June Wilder and petitioner Audrey S. Wilder, determining both that the payments at issue are nondeductible by the former and taxable to the latter.↩
2. All references are to the Internal Revenue Code of 1954.↩
3. Robert claimed in his return and respondent disallowed an alimony deduction in 1969 of $26,771.52, but Robert has conceded that he is not entitled to such a deduction in this year in excess of the $24,400 here in issue.↩
4. SEC. 71. ALIMONY AND SEPARATE MAINTENANCE PAYMENTS. (a) General Rule. -- (1) Decree of divorce or separate maintenance. -- If a wife is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation. ↩
5. SEC. 215. ALIMONY, ETC., PAYMENTS. (a) General Rule.--In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. No deduction shall be allowed under the preceding sentence with respect to any payment if, by reason of section 71(d) or 682↩, the amount thereof is not includible in the husband's gross income.
6. Sec. 1.71-1(d)(3)(i), Income Tax Regs.
Where payments under a decree, instrument, or agreement are to be paid over a period ending 10 years or less from the date of such decree, instrument, or agreement, such payments are not installment payments discharging a part of an obligation the principal sum of which is, in terms of money or property, specified in the decree, instrument, or agreement (and are considered periodic payments for the purposes of section 71(a)) only if such payments meet the following two conditions: (a) Such payments are subject to any one or more of the contingencies of death of either spouse, remarriage of the wife, or change in the economic status of either spouse, and (b) Such payments are in the nature of alimony or an allowance for support.↩